1999 OK 88

**N.H., a minor, et al., Plaintiffs/Appellants,**

v.

**PRESBYTERIAN CHURCH (U.S.A.), an unincorporated association, Defendant/Appellee.**

No. 92953.

Supreme Court of Oklahoma.

Nov. 2, 1999.

Michael M. Blue, John M. Merritt, Oklahoma City, Oklahoma, For Plaintiffs/Appellants.

Graydon Dean Luthey, Jr., Tulsa, Oklahoma, For Defendant/Appellee.

John B. Jarboe, Tulsa, Oklahoma, Mark E. Chopko, General Counsel, Michael F. Moses, Assistant General Counsel, United States Catholic Conference, Washington, D.C., For Amici Curiae.

1. On summary judgment and in the brief on appeal, Hosey asserts that the national organization was negligent *per se* for its failure to report suspected child abuse under 10 O.S. Supp.1998 § 7102 providing in pertinent part:

 "... Any person who knowingly and willfully fails to promptly report any incident as provided in this section may be reported by the Department of Human Services to local law enforcement for criminal investigation and, upon conviction thereof, shall be guilty of a misdemeanor...."

 Although the statute has been amended since the incidents, the version in effect at the time contained identical language to that referring to knowing and willful conduct. It is undisputed that there was no actual knowledge on the part of the national organization; and, under the facts presented, knowledge may not be imputed. See, discussion, pp. ————. Additionally, an employers query to an employee on sexual behavior may be subject to constitutional claims for invasion of privacy and sexual harassment. See, *Roman Catholic Bishop of San Diego v. Superior*

¶ 1 KAUGER, J.:

¶ 2 We retained this cause to consider,[1] under the facts presented: 1) whether *respondeat superior* liability may be imposed against the defendant/appellee, Presbyterian Church (U.S.A.) (national organization), for tortious acts of its minister, Robert Bruce Brigden (Brigden); 2) whether the national organization is liable for negligence in hiring, retaining or supervising Brigden; and 3) whether a First Amendment[2] analysis is necessary to resolve the issues. For the purposes of this opinion, we presume that an employer-employee relationship existed between the national organization and Brigden. Under the facts presented, we hold that the national organization is not liable for Brigden's tortious conduct. Because no basis exists to impose liability against the national organization, we decline, as we did in *Bladen v. First Presbyterian Church of Sallisaw,* 1993 OK 105, ¶ 29, 857 P.2d 789, 797, to determine whether the First Amendment stands as a bar to all employment-related liability of an ecclesiastical organization for its ministerial officers.

## ALLEGED FACTS

¶ 3 The cause arises from actions occurring in 1990 and in 1991 while Brigden served as a minister of the First Presbyterian Church in Alva, Oklahoma [Alva Church]. Brigden was

*Court,* 42 Cal.App.4th 1556, 50 Cal.Rptr.2d 399, 404 (1996).

2. The United States Const., amend. 1 provides in pertinent part:

 "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ..."

 The Free Exercise Clause of the First Amendment is applicable to the states through the Fourteenth Amendment. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 113 S.Ct. 2217, 2225, 124 L.Ed.2d 472 (1993). Oklahomans also have an additional guarantee of religious freedom. The Okla. Const., art. 1, § 2 provides:

 "Perfect toleration of religious sentiment shall be secured, and no inhabitant of the State shall ever be molested in person or property on account of his or her mode of religious worship; and no religious test shall be required for the exercise of civil or political rights. Polygamous or plural marriages are forever prohibited."

ordained as a Presbyterian minister on July 1, 1960. Prior to his employment in Alva, Brigden served as a minister of the Presbyterian Church in Wellington, Kansas from July of 1969 to March of 1980. During this period, there were complaints from members of his congregation lodged with the church session (elders) and with a representative of the Presbytery of Southern Kansas (a group composed of several churches in the geographical area).[3] The allegations concerned his relationship with minors.[4] On January 27, 1980, a special congregational meeting of the Wellington church was called to approve dissolution of the ministerial relationship effective July 1,1980, or at an earlier date if Brigden received a call to another congregation.[5]

3. Record exhibit # 24, affidavit of Brenda Turner, providing in pertinent part:
    "... In addition to approaching the Church Session in 1978, Virginia Hyten and I also went to see a member of the Presbytery of Southern Kansas. We described these events to him. He tried to dismiss our concerns. We subsequently learned that his daughter and Bruce Brigden's wife were good friends...."

4. Record exhibit # 21: Minutes of the Session Meeting of the First Presbyterian Church, Wellington, Kansas, October 19, 1977, providing in pertinent part:
    "... Upon motion duly made and carried, Session voted that no snakes are to be brought or kept in the Church...."
    Minutes of the Session Meeting of the First Presbyterian Church, Wellington, Kansas, September 20, 1978, providing in pertinent part:
    "... Virginia Hyten said that she feels that Brigden's time as pastor of the First Presbyterian Church, Wellington, is up. She gave no reasons and requested that Ministerial Relations be contacted via letter...."
    Record exhibit # 24, affidavit of Brenda Turner, providing in pertinent part:
    "... 3. I enrolled my then three and one-half-year old daughter, Lori, in the First Presbyterian Church of Wellington Nursery School in approximately 1971. My daughter reported to me that Bruce Brigden had come to the nursery school with snakes and had allowed snakes to crawl on her. I spoke to the teachers in the nursery and told them that they were to keep Bruce Brigden and the snakes away from my daughter....
    4. ... [Brigden] came by my home and picked up my minor child, Leigh Anne, without my consent, and took her riding on his motor scooter to the park....
    6. On two separate occasions I went to the Church Session about the conduct of Bruce

¶ 4 Effective March 24, 1980, Brigden transferred from the Wellington Church to Beloit, Kansas, where he served as minister until May of 1987. Upon the transfer, the Presbytery of Southern Kansas did not inform the Presbytery of Northern Kansas of any problems with the minister. Rather, Brigden was described as a "faithful Presbyter."[6] At the Beloit church, concerns relating to Brigden's conduct surfaced again. Some of these complaints specifically related to his involvement with children.[7] Although a representative of the Presbytery of Northern Kansas attended a session meeting where some of these concerns were voiced, the representative did not report the concerns to the regional organization. Before leaving the Beloit church, Brigden's attendance at a psy-

Brigden. Among my expressed concerns were the fact that Mr. Brigden was passing out pennies and candy to little children....
9. Bruce Brigden's conduct around children caused me to fear that he was attempting to entice children into inappropriate contact...."

5. Record exhibit # 21 minutes of Special Congregational Meeting, January 27, 1980, providing in pertinent part:
    "... The meeting was called for the purpose of concurring with the request of the pastor to ask the Presbytery of Southern Kansas to dissolve the pastoral relationship between him and the First Presbyterian Church, Wellington ... The Congregation voted to concur with the request ... and ask the Presbytery of Southern Kansas to dissolve the pastoral relationship between him and First Presbyterian Church, Wellington, Kansas, On July 1, 1980, or on any earlier date following his reception of an approved call to another church...."

6. Record exhibit # 16, letter of Rev. Paul H. Mueller, Stated Clerk, Presbytery of Southern Kansas, providing in pertinent part:
    "... You will find Bruce a faithful Presbyter. We commend him to you...."

7. Record exhibit # 22: Minutes of the Session Meeting of the First United Presbyterian Church, Beloit, Kansas, May 11, 1980, providing in pertinent part:
    "... NO TREATS AT CHURCH: BY: by motion, the pastor was instructed to discontinue giving gum or candy as treats for children at the church, or elsewhere except to his family, or guests in his home...."
    Item titled "Complaints received by session members", providing in pertinent part:
    "... 3. Still giving candy to children, uncomfortable having my children with Bruce...."

chiatric facility for evaluation was approved.[8] Brigden was referred to the Menninger. Foundation by the Committee on Ministry of the Presbytery of Northern Kansas.[9] The diagnostic interview report prepared during Brigden's stay indicated that any contact he might have with children should be. monitored.[10] Without having obtained a copy of the report, the Presbytery of Northern Kansas approved Brigden's move to the Cimarron Presbytery of Oklahoma representing him "as a member in good standing ... to whose fraternal affection and fellowship this minister is hereby cordially commended...." [11]

¶ 5 Effective, August 23, 1987, Brigden was transferred to the Alva Church at which time the Presbytery of Northern Kansas characterized the minister as a "member in good standing."[12] Brigden served as a counselor at a Presbyterian children's camp from August 6–12, 1989. While there, serious allegations of inappropriate behavior with minors were raised by camp counselors. These concerns were communicated to the Chairman of the Cimarron Presbytery Committee on Ministry. However, the concerns were not shared with anyone at the Alva Church or with the general assembly of the national organization.[13]

¶ 6 Although ecclesiastical authorities at the session and presbytery levels of the church..structure were aware of complaints involving Brigden at each of the three churches where he served, these concerns were not communicated to anyone at the national organization. Not only were worries about his behavior not shared as Brigden transferred from church-to-church, Brigden

---

8. Record exhibit # 22: Minutes of the Session Meeting of the First Presbyterian Church, Beloit, Kansas, October 1, 1986, providing in pertinent part:

   "... MENNINGER EVALUATION: as a part of the process for moving, the Pastor was allowed to use a week of his study leave for an evaluation at the Menninger Foundation in Topeka, on October 27–31...."

9. Record exhibit # 25: Menninger Foundation Psychological test report, p. 1 providing in pertinent part:

   ."... The patient, a 51–year–old, married Presbyterian minister, was referred to the Menninger Foundation for an outpatient evaluation by the Committee on Minstry [sic] of his Presbytery...."

10. Record exhibit # 25: Diagnostic interview report, prepared by Dr. Patrick J. Dattore, dated October 27–31, 1986, providing in pertinent part:.

    "... Given this, however, as well as his significant difficulty in judging the appropriateness of his actions, this man might be in danger of unwittingly coming on too strongly physically. He will need help, therefore, in not being inappropriate in his wish to touch others, especially since he is particularly attracted to children...."

11. Presbytery Dismission of a Minister, record exhibit # 16, dated August 18, 1987.

12. Record exhibit # 16 Presbytery of Northern Kansas, Presbytery Dismission of a Minister, providing in pertinent part:

    "... This is to certify that the Rev. R. Bruce Brigden ... is a member in good standing in this Presbytery ..."

13. Deposition testimony of Jerry Max Hilton, September 17, 1993, providing in pertinent part at pp. 25–40:

    "... Q  I want to talk about now the problems that arose at the Dwight Mission Camp. I take it you are familiar with that?
    A  Yes, sir....
    Q  Why did you think it was a serious matter?
    A  Because the possibility of misconduct was raised and he had been sent home one day early.
    Q  It is fair to say that the question or some of the warning signs of pedophilia were raised in these letters?  Is that true?
    ... A  I would think so....
    Q  Did you share them with anyone who was a member at the Alva church?
    A  No.
    Q  Before you met with Reverend Brigden, did you discuss with anyone from the Alva church the allegations that had been made against Reverend Brigden?
    A  No.
    Q  Did you contact the General Assembly for guidance in handling this matter?
    A  Not at that time....
    Q  After you conducted this investigation what action did you take in relation to Reverend Brigden?
    A  We took no further action....
    Q  Prior to the arrest of Reverend Brigden in 1991, did you or Reverend Conditt ever make any effort to disclose these allegations to anyone at the Alva church?
    A  No, sir.
    Q  Prior to his arrest, Reverend Bridgen's arrest in 1991, did you disclose any of these allegations to the General Assembly?

was recommended favorably to the receiving ministries.[14]

¶ 7 During his tenure as minister of the Alva Church, Brigden sexually molested twelve minors.[15] Although some of the children molested may have been from Presbyterian families, many of the children molested were not church members or the children of members of the congregation. Rather, Brigden committed the acts during recreational activities aimed at recruiting new members and their families. Most of the acts occurred in the church manse—housing provided to Brigden and his family by the church.

¶ 8 On September 30, 1997, the minors, represented by the plaintiff/appellant, N.H. (N.H.), filed suit against the national organization of the Presbyterian Church alleging its liability for Brigden's conduct. N.H. does not assert that anyone other than Brigden actually committed the acts, and the complaint does not name the minister or his estate, the local congregation, the session (composed of elders of the local church), the presbytery (composed of several churches in the geographical area), the synod (composed of all presbyteries within a state), or the general assembly (the highest governing body).[16] Rather, N.H. named only the national organization which is characterized as an unincorporated association made up of all members of the Presbyterian Church governed by the general assembly.[17] N.H. sought recovery under the doctrine of *respondeat superior* and for negligence in hiring, retaining and supervising Brigden.[18]

¶ 9 The national organization filed a motion for summary judgment on July 15, 1998. It asserted that the First Amendment prevented the trial court from proceeding. The national organization also argued that any liability based upon a master/servant or principal/agent theory must fail, because it had no authority over the ordination of Brigden as a minister or his hiring at the Alva Church or elsewhere. The trial court sustained the national organization's motion for summary judgement on March 23, 1999, finding that "all of the claims and causes of actions [sic] pursued by the Plaintiffs herein are barred by the First Amendment to the United States Constitution."[19] On May 11, 1999, N.H. appealed, and the parties filed a joint

A No, sir...."

14. Hosey's reply brief, filed August 23, 1999, pp. 2–6.

15. Brigden was convicted of lewd molestation and rape by instrumentation. He was killed in prison on June 12, 1994. *Wood v. State*, 1998 OK CR 19, ¶ 2, 959 P.2d 1.

16. The United States Supreme Court characterized the structure of the presbyterian faith in *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 stating:
"Petitioner, Presbyterian Church in the United States, is an association of local Presbyterian churches governed by a hierarchical structure of tribunals which consists of, in ascending order, (1) the Church Session, composed of the elders of the local church; (2) the Presbytery, composed of several churches in a geographical area; (3) the Synod, generally composed of all Presbyteries within a State; and (4) the General Assembly, the highest governing body."

17. Appellant's Brief in Chief, p. 1.

18. N.H. identifies the range of claims as including: negligence; negligent hiring; negligent retention and negligent supervision of Brigden; failure to properly and adequately supervise and evaluate Brigden; failure to investigate allegations of Brigden's inappropriate behavior with children; failure to take appropriate and corrective action as a result of Brigden's inappropriate behavior with children; failure to warn the various church bodes and the minors and their parents of Brigden's propensity to engage in inappropriate sexual conduct with children; *respondeat superior*; vicarious liability; and breach of fiduciary duty. Appellant's Brief in Chief, p. 2.

19. Order of judgment entered on March 23, 1999. N.H. asserts that the judgment did not resolve all the issues before the trial court. However, the language of the order is clear. The trial judge found all of N.H.'s claims and theories to be barred by the First Amendment, see note 2, supra. The order provides in pertinent part:
"... On the 11th day of December, 1998 came on for consideration the Motion for Summary Judgment filed by Defendant, Presbyterian Church (U.S.A.), an unincorporated association, and the Court having considered the Motion and Briefs of the parties herein found that the Motion for Summary Judgment [sic] should be granted because all of the claims and causes of actions [sic] pursued by the Plaintiffs herein are barred by the First

motion to retain. The motion was granted on June 1, 1999, and briefs were ordered. On August 19, 1999, we granted *amici curiae's* [20] application to file a brief in support of the national organization. The final brief was filed on August 23, 1999.

## I.

¶ 10 **ASSUMING THE EXISTENCE OF AN AGENCY RELATIONSHIP,LIABILITY MAY NOT BE IMPOSED FOR BRIGDEN'S ACTS.**

¶ 11 N.H. alleges that there are material issues of fact militating against the entry of summary judgment on the existence of an employment relationship and on questions of liability under the doctrine of *respondeat superior* and for negligence in hiring, retaining and supervising Brigden. The national organization argues that no agency relationship existed. Assuming the relationship, it urges that liability may not be imposed, because: 1) the acts were outside the scope of employment; and 2) it had no notice of Brigden's activities or propensities.

¶ 12 Agency is generally a question of fact determined by the trier of fact.[21] The burden of proving agency rests on the party asserting it.[22] In the Presbyterian Church structure, the presbytery (the local congrega-

tion) is responsible for examining, ordaining, installing, dismissing and otherwise disciplining ministers.[23] Even the session, composed of the presbytery's elders, may not remove a pastor without the former's consent.[24] Nevertheless, the national organization has been found to exert sufficient control over a pastor and the congregation to allow jurisdiction under a long-arm statute.[25] Because we presume that Brigden was the national organization's agent for the purposes of this opinion, we need not determine the exact parameters of the relationship between a Presbyterian minister and the national organization.

¶ 13 A. **UNDER THE DOCTRINE OF RESPONDEAT SUPERIOR—THE ACTS WERE OUTSIDE THE SCOPE OF EMPLOYMENT AS A MATTER OF LAW.**

¶ 14 *Respondeat superior* is a legal doctrine holding an employer liable for the willful torts of an employee acting within the scope of employment in furtherance of assigned duties.[26] Generally, an assault upon a third person is not within the scope of employment.[27] Exceptions to the general rule exist if: 1) the act is fairly and naturally incident to the employer's business; 2) the act occurs while the employee is engaged in an act for the employer; or 3) the assault

Amendment to the United States Constitution …"

20. The *amici curiae* are: the Baptist General Conference, Baptist Joint Committee on Public Affairs, Christian Methodist Episcopal (CME) Church, Evangelical Lutheran Church in America, General Council on Finance and Administration of the United Methodist Church, General Conference of Seventh–Day Adventists, and United States Catholic Conference.

21. *Bell v. Tollefsen*, 1989 OK 149, ¶ 10, 782 P.2d 934; *Paul Hellman, Inc. v. Reed*, 1961 OK 262 ¶ 9, 366 P.2d 391; *Magnolia Petroleum Co. v. Angelly*, 1955 OK 361, 306 P.2d 309, 315.

22. *Bell v. Tollefsen*, see note 21, supra; *Banning Transp., Inc. v. Vansickle*, 1974 OK 114, ¶ 10, 527 P.2d 586; *Agee v. Gant*, 1966 OK 31, ¶ 19, 412 P.2d 155.

23. S. Young, "Sexual Molestation within America's Parishes and Congregations: Should The Church be 'Thy Priest's Keeper'?", 91 W.Va. L.Rev. 1097, 1123 (1989). See also, *Presbyterian Church in the United States v. Mary Elizabeth*

*Blue Hull Memorial Presbyterian Church*, note 16, supra.

24. *Schmidt v. Bishop*, 779 F.Supp. 321, 331 (S.D.N.Y.1991).

25. *Johnston v. United Presbyterian Church in the United States of America, Inc.*, 103 Ill.App.3d 869, 59 Ill.Dec. 518, 431 N.E.2d 1275, 1279, 26 A.L.R.4th 1168 (1981). See also, *Olson v. Magnuson*, 457 N.W.2d 394, 397 (Minn.App.1990).

26. *Sides v. John Cordes, Inc.*, 1999 OK 36, ¶ 7, 981 P.2d 301; *Jordan v. Cates*, 1997 OK 9, ¶ 11, 935 P.2d 289; *Brown v. Ford*, 1995 OK 101, ¶ 12, 905 P.2d 223; *Graham v. Keuchel*, 1993 OK 6 at note 36, 847 P.2d 342.

27. *Rodebush v. Oklahoma Nursing Homes, Ltd.*, 1993 OK 160, ¶ 12, 867 P.2d 1241; *Hill v. McQueen*, 1951 OK ——, ¶ ——, 204 Okla. 394, 230 P.2d 483, 485, 22 A.L.R.2d 1220. See also, Note, "RODEBUSH: Finding the Road to Strict Liability for the Intentional Torts of Employees," 30 Tulsa L.J. 375 (1994).

arises from a natural impulse growing out of or incident to the attempt to complete the master's business.[28] Nevertheless, an assertion that an act is accomplished during an employment activity is insufficient to assess liability against the employer unless the act was done to accomplish the assigned work.[29]

¶ 15 We held in *Rodebush v. Oklahoma Nursing Homes, Ltd.,* 1993 OK 160, ¶ 15, 867 P.2d 1241, that a nursing home employee was within the scope of employment when he struck an Alzheimer patient during a bathing procedure. The attendant had been assigned the specific duty of bathing Alzheimer patients known to be combative. No evidence was presented that the aide had been told not to strike patients. In *Rodebush,* the aide's act was an impulsive action naturally arising from the situation he had been placed in by the employer.

¶ 16 In *Rodebush,* the aide had to control a combative patient. The assault was an impulsive response to attempt to complete the patient's bath. Although Brigden's acts may have arisen from some "impulse" while he was supposedly approaching the children to bring them to the Presbyterian faith, no one contends that sexual acts with minors are in any manner authorized or condoned by the national organization. Assuredly, the acts are condemned by the Presbyterian Church.

Undoubtedly, such conduct is an anathema to the national organization's religious practices.

■ ¶ 17 Our survey of national jurisprudence reveals that the majority of jurisdictions considering the issue of sexual contact between an ecclesiastic officer and a parishioner have held that the act is outside the scope of employment as a matter of law.[30] We agree. Ministers should not molest children. When they do, it is not a part of the minister's duty nor customary within the business of the congregation.[31] Rather than increasing membership, the conduct would assuredly result in persons spurning rather than accepting a faith condoning the abhorrent behavior. No reasonable person would conclude that Brigden's sexual misconduct was within the scope of employment or in furtherance of the national organizations's business.

■ ¶ 18 Brigden acted for his own personal gratification rather than for any religious purpose. Brigden abused his position and exploited his special relationship with the children. It is inconceivable that Brigden's acts were of the nature of those which he was hired to perform. Because Brigden was acting outside the scope of his employment as a

**28.** *Rodebush v. Oklahoma Nursing Homes, Ltd.,* see note 27, supra; *Russell–Locke Super–Service Inc. v. Vaughn,* 1935 OK 90, ¶——, 170 Okla. 377, 40 P.2d 1090, 1094.

**29.** *Mistletoe Express Serv. v. Culp,* 1959 OK ——, ¶——, 353 P.2d 9.

**30.** *Tichenor v. Roman Catholic Church of New Orleans,* 32 F.3d 953, 959–60 (5th Cir.1994); *Kennedy v. Roman Catholic Diocese of Burlington,* see note 47 at 233, infra; *Nutt v. Norwich Roman Catholic Diocese,* see note 47 at 70, infra; *Moses v. Diocese of Colorado,* 863 P.2d 310, 320 (Colo.1993), *cert. denied,* 511 U.S. 1137, 114 S.Ct. 2153, 128 L.Ed.2d 880 (1994); *Gibson v. Brewer,* see note 47 at 245, infra; *Byrd v. Faber,* 57 Ohio St.3d 56, 565 N.E.2d 584, 588, 5 A.L.R.5th 1115 (1991); *Payne v. Osborne,* 1999 WL 354495 (Ky.App.1999); *Doe v. Hartford Roman Catholic Diocesan Corp.,* see note 47 at 962–63, infra; *Kenneth R. v. Roman Catholic Diocese of Brooklyn,* see note 47 at 793, infra; *Konkle v. Henson,* 672 N.E.2d 450, 457 (Ind.App.1996);

*H.R.B. v. J.L.G.,* 913 S.W.2d 92, 96 (Mo.App. 1995); *Joshua S. v. Casey,* 206 A.D.2d 839, 615 N.Y.S.2d 200 (1994); *Jones v. Trane,* 153 Misc.2d 822, 591 N.Y.S.2d 927, 931 (1992); *Reynolds v. Zizka,* 1998 WL 123047 (Conn.Super.1998); *Rita M. v. Roman Catholic Archbishop of Los Angeles,* 187 Cal.App.3d 1453, 1461, 232 Cal.Rptr. 685 (1986). See also, *Niece v. Elmview Group Home,* 131 Wash.2d 39, 929 P.2d 420, 428 (1997) [Employers are not vicariously liable for intentional sexual assault by employee.]. But see, *Doe v. Hartz,* note 37 at 1073–74, infra [Question of fact existed for purposes of *respondeat superior* where church officials had notice of sexual practices.]; *Barquin v. Roman Catholic Diocese of Burlington,* see note 47 at 281, infra [Question of fact existed for purposes of vicarious liability claims.]; *Parks v. Kownacki,* see note 47, infra [Special circumstances of case in which minor was a resident of parish owned property left question of fact to be resolved on vicarious liability claim.].

**31.** *Moses v. Diocese of Colorado,* 863 P.2d 310 (Colo.1993).

matter of law when the molestation occurred, we hold that liability may not be imposed under the doctrine of *respondeat superior*.[32]

¶ 19 **B. BECAUSE THE NATIONAL ORGANIZATION WAS UNAWARE OF BRIGDEN'S ACTS AND PROPENSITIES, A CAUSE OF ACTION WILL NOT LIE FOR NEGLIGENT HIRING, RETENTION OR SUPERVISION.**

¶ 20 Employers may be held liable for negligence in hiring, supervising or retaining an employee.[33] In such instances, recovery is sought for the employer's negligence.[34] The claim is based on an employee's harm to a third party through employment. An employer is found liable, if—at the critical time of the tortious incident—, the employer had reason to believe that the person would create an undue risk of harm to others. Employers are held liable for their prior knowledge of the servant's propensity to commit the very harm for which damages are sought.[35] In Oklahoma, the theory of recovery is available if vicarious liability is not established.[36] In other jurisdictions, actions against churches for negligent hiring, supervision and retention have been allowed when the supervising authority had notice sufficient to prevent reasonably foreseeable harm caused by sexual advances of its ecclesiastical representatives.[37]

¶ 21 The critical element for recovery is the employer's prior knowledge of the servant's propensities to create the specific danger resulting in damage.[38] Before N.H. may recover, it would be necessary to demonstrate that the national organization had notice of Brigden's deviant sexual tendencies before his transfer to the Alva Church.[39] There is nothing in the record to

32. Arguments that the national organization ratified Brigden's acts, thus becoming liable for conduct outside the scope of employment, are likewise unconvincing. *Stuart, Inc. v. Bennett*, 1980 OK 135, ¶ 27, 617 P.2d 879. An agent's acts in violation of corporate policy will not bind a principal. *Continental Supply Co. v. Sinclair Oil & Gas Co.*, 1924 OK ——, ¶ ——, 109 Okla. 178, 235 P. 471, 474. There is nothing to indicate that any benefits were derived or accepted as a result of Brigden's tortious conduct sufficient to impose liability on the national organization. *Stuart, Inc. v. Bennett*, see this note, supra. See also, discussion concerning lack of notice to the national organization, pp. ——-——; *A.A. Murphy, Inc. v. Banfield*, 1961 OK 197, ¶ 8, 363 P.2d 942.

33. *Jordan v. Cates*, 1997 OK 9, ¶ 12, 935 P.2d 289; *Dayton Hudson Corp. v. American Mut. Liability Ins. Co.*, 1980 OK 193, ¶ 17, 621 P.2d 1155,16 A.L.R.4th 1; *Mistletoe Express Serv., Inc. v. Culp*, 1960 OK ——, ¶ ——, 353 P.2d 9.

34. *Dayton Hudson Corp. v. American Mutual Liability Ins. Co.*, see note 33, supra.

35. *Jordan v. Cates*, see note 33, supra; *Dayton Hudson Corp. v. American Mutual Liability Ins. Co.*, see note 33, supra.

36. *Jordan v. Cates*, see note 33, supra.

37. *Doe v. Hartz*, 52 F.Supp.2d 1027, 1072 (N.D.Iowa 1999); *Kennedy v. Roman Catholic Diocese of Burlington*, see note 47, infra; *Nutt v. Norwich Roman Catholic Diocese*, see note 47 at 73, infra; *Isely v. Capuchin Province*, see note 47, infra; *Smith v. O'Connell*, see note 47, infra; *Bear Valley Church of Christ v. DeBose*, see note 47 at 1326, infra; *Van Osdol v. Vogt*, 908 P.2d 1122, 1132 (Colo.1996); *Moses v. Diocese of Colorado*, 863 P.2d 310, 328 (Colo.1993); *Parks v. Kownacki*, see note 47, infra; *Kenneth R. v. Roman Catholic Diocese of Brooklyn*, see note 47 at 795, infra; *Jones v. Trane*, 153 Misc.2d 822, 591 N.Y.S.2d 927, 931 (1992); *Roman Catholic Bishop of San Diego v. Superior Court*, see note 1 at 404, supra. See also, *Gibson v. Brewer*, note 47, infra, in which the court found that although the church could not be held liable for negligent supervision, it would be held responsible for intentional failure to supervise an ecclesiastical authority. But see, *Pritzlaff v. Archdiocese of Milwaukee*, note 47, infra, holding that First Amendment barred action for negligence in hiring, retaining, training, or supervising priest.

38. *Dayton Hudson Corp. v. American Mutual Liability Ins. Co.*, see note 33, supra. See also, *Isely v. Capuchin Province*, note 47, infra [Without evidence that abuse was reported to church defendant, no liability would be imposed.]; *Roman Catholic Bishop of San Diego v. Superior Court*, see note 1 at 404, supra [Lack of criminal conviction or actual knowledge prevented imposition of liability.].

39. See, *Smith v. O'Connell*, 997 F.Supp. 226, 241 (D.R.I.1998), *aff'd*, 187 F.3d 192 (1st Cir.1999); *Jones v. Trane*, note 30, supra; *Kennedy v. Roman Catholic Diocese of Burlington*, see note 47, infra; *Barquin v. Roman Catholic Diocese of Burlington*, see note 47, infra.

indicate that Brigden had a criminal history before moving to Alva. Although concerns had been voiced previously concerning his conduct and contact with children at the presbytery level, there is no evidence that those concerns were communicated to the national organization or to members of the Alva Church. Rather, in the transfers from church-to-church, Brigden was described as a "faithful Presbyter"[40] and recommended "as a member in good standing ... to whose fraternal affection and fellowship this minister is hereby cordially commended...."[41] Reports which would have alerted the Alva Church of Brigden's propensities were not obtained by his preceding congregational leaders.[42] Concerns about Brigden's conduct at a youth camp after his transfer to Alva was approved were not communicated either to the Alva Church or the national organization.[43]

¶ 22 Knowledge of an agent is imputed to the principal absent circumstances raising a clear presumption that the agent will not communicate the knowledge to the principal.[44] Here, it is obvious that not only was the national organization not advised of the situation, evidence of Brigden's propensities may have been intentionally withheld from members at both the national and the local church level. We hold that the action for negligent hiring, retention and supervision fails because the national organization lacked knowledge sufficient to impose liability.

## II.

¶ 23 PURSUANT TO *BLADEN v. PRES-BYTERIAN CHURCH OF SALLISAW*, THE LACK OF AN UNDERLYING RE-LATIONSHIP SUPPORTING AN AWARD AGAINST THE NATIONAL ORGANIZATION RENDERS A FIRST AMENDMENT ANALYSIS UNNECES-SARY.

¶ 24 N.H. asserts that claims against the national organization do not contravene the First Amendment. Although in granting summary judgment, the trial court found that all claims and causes of action were barred by the Constitution,[45] the national organization invokes First Amendment protection only for liability for negligent hiring, retention and supervision.[46]

¶ 25 Both parties rely on *Bladen v. First Presbyterian Church of Sallisaw*, 1993 OK 105, ¶ 29, 857 P.2d 789, 797. In *Bladen*, a husband and wife brought suit against a local church and its minister for an adulterous affair conducted between the minister and the wife. The affair occurred while the minister was providing the couple with marital counseling. Finding that the minister was not liable, we refused to consider claims against the church under the doctrine of *respondeat superior* or for negligent hiring and supervision. In so doing, the Court did not reach the issue of whether the Constitution barred civil courts from defining the nature of the employment criteria a church should use in selecting individuals for ecclesiastical office.

40. See discussion and accompanying note, p. 595, supra.

41. See discussion and accompanying note, pp. 595–596, supra.

42. See discussion and accompanying note, p. 595, supra.

43. See discussion and accompanying note, p. 596, supra.

44. *Stuart, Inc. v. Bennett*, see note 32, supra; *A.A. Murphy, Inc. v. Banfield*, see note 32, supra.

45. The trial court's order, filed on March 23, 1999, see note 19, supra.

46. The national organization's answer brief provides in pertinent part at p. 11:

"... THE FIRST AMENDMENT PRECLUDES SUBJECT MATTER JURISDICTION OVER THE CLAIMS AGAINST THE NATIONAL CHURCH FOR THE HIRING, RETENTION AND SUPERVISION OF THE LOCAL MINISTER BRIDGES...."

An admission in the brief may be regarded as a supplement to the appellate record. *Wright v. Grove Sun Newspaper Co., Inc.*, 1994 OK 37, ¶ 2, 873 P.2d 983; *Kwikset/Emhart v. Mayberry*, 1990 OK 112, ¶ 3, 800 P.2d 239; *Reeves v. Agee*, 1989 OK 25, ¶ 15, 769 P.2d 745; *Womack v. City of Oklahoma City*, 1986 OK 14, ¶ 10, 726 P.2d 1178.

¶ 26 *Bladen* did not address the First Amendment question because there was no underlying employee liability to support recovery against the church. Here, we are in a similar procedural posture. The specific governmental interference challenged is civil court enforcement of tort law against the religious organization. Because we hold that—even assuming an agency or employment relationship between Brigden and the national organization—no liability may be imposed, we need not determine whether the First Amendment would stand as a bar to all employment-related liability of an ecclesiastical organization for its ministerial officers.[47]

## CONCLUSION

■ ¶ 27 The First Amendment does not grant religious organizations blanket immunity from suit.[48] The parties do not contend—and this Court would not sanction an argu-

---

47. While we need not answer this question today, we note that there is a split of authority among the courts considering similar liability issues under First Amendment principles. Some jurisdictions have found jurisdiction despite constitutional arguments. See, *Doe v. Hartz*, note 37 at 1079 [Refusing to dismiss cause on First Amendment ground at stage of proceeding when extent of entanglement could not be determined.]; *Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 10 F.Supp.2d 138, ·139–40 (D.Conn.1998) [First Amendment did not bar action against church for breach of fiduciary duty claim arising from sexual abuse.]; *Smith v. O'Connell*, 986 F.Supp. 73, 77 (D.R.I.1997) [Tort liability for sexual abuse of minors did not interfere with religious activities under First Amendment.]; *Kennedy v. Roman Catholic Diocese of Burlington*, 921 F.Supp. 231, 233 (D.Vt.1996) [First Amendment did not bar negligent hiring claim.]; *Nutt v. Norwich Roman Catholic Diocese*, 921 F.Supp. 66, 70 (D.Conn.1995) [First Amendment did not bar action for negligent employment.]; *Isely v. Capuchin Province*, 880 F.Supp. 1138, 1151 (E.D.Mich.1995) [First Amendment no bar to negligent supervision claim ]; *Barquin v. Roman Catholic Diocese of Burlington*, 839 F.Supp. 275, 282 (D.Vt.1993) [Dismissal on First Amendment grounds premature where issues of knowledge of the church officials for negligent hiring remained unresolved.]; *Gibson v. Brewer*, 952 S.W.2d 239, 247 (Mo.1997) [Although claims of negligence against church would be barred by First Amendment, claims of intentional acts not barred.]; *Bear Valley Church of Christ v. DeBose*, 928 P.2d 1315, 1321–23 (Colo.1996), *cert. denied*, 520 U.S. 1241, 117 S.Ct. 1846, 137 L.Ed.2d 1049 and 520 U.S. 1248, 117 S.Ct. 1862, 137 L.Ed.2d 1062 (1997) [First Amendment did not protect church from liability for purposes of actions in hiring, supervision, discipline and discharge of minister.]; *Parks v. Kownacki*, 305 Ill.App.3d 449, 238 Ill. Dec. 547, 711 N.E.2d .1208, 1214–16 (1999) [First Amendment did not bar either *respondeat superior* or negligent hiring claims.]; *Doe v. Hartford Roman Catholic Diocesan Corp.*, 45 Conn. Supp. 388, 716 A.2d 960, 964 (1998) [First Amendment does not bar claims for negligent hiring, training, retention and supervision or for negligent infliction of emotional distress.]; *Kenneth R. v. Roman Catholic Diocese of Brooklyn*, 229 A.D.2d 159, 654 N.Y.S.2d 791, 795 (1997), *cert. denied*, 522 U.S. 967, 118 S.Ct. 413, 139 L.Ed.2d 316 (1997); *Doe v. Dorsey*, 683 So.2d 614, 616 (Fla.App.1996), *review denied*, 695 So.2d 699 (1997) [State may protect children against injuries caused by pedophiles by authorizing civil damages against church.]; *F.G. v. MacDonell*, 291 N.J.Super. 262, 677 A.2d 258, 262 (1996) [First Amendment did not bar adjudication where allegations involved sexual misconduct of priest.]; *Mrozka v. Archdiocese of St. Paul & Minneapolis*, 482 N.W.2d 806, 811 (Minn.Ct. App.1992), *review denied* (1992) [State's interest in protecting children from sexual abuse sufficient to justify indirect burden church might incur.] But see, *Schmidt v. Bishop*, note 24, supra [Inquiry into policies of church defendants in hiring or supervising clergy raises First Amendment entanglement problems.]; *C.J.C v. Corporation of the Catholic Bishop of Yakima*, 138 Wash.2d 699, 985 P.2d 262 (1999) [First Amendment prevented inquiry into causes of action against church based on sexual misconduct.]; *Gibson v. Brewer*, 952 S.W.2d 239, 246 (Mo.1997) [Constitutional protection barred inquiries into negligent hiring, retention and supervision of priest.]; *Swanson v. Roman Catholic Bishop of Portland*, 1997 ME 63, 692 A.2d 441, 445; *Pritzlaff v. Archdiocese of Milwaukee*, 194 Wis.2d 302, 533 N.W.2d ·780, 789 (1995), *reh'g denied*, 540 N.W.2d 203, *cert. denied*, 516 U.S. 1116, 116 S.Ct. 920, 133 L.Ed.2d 849 (1996) [First Amendment barred action against archdiocese for negligence in hiring, retaining, training, or supervising priest.]; *Murphy v. I.S.K.Con. of New England, Inc.*, 409 Mass. 842, 571 N.E.2d 340, 350 (1991) [First Amendment barred adjudication of intentional infliction of emotional distress where claim could not stand in absence of testimony regarding religious beliefs.]; *Langford v. Roman Catholic Diocese of Brooklyn*, 177 Misc.2d 897, 677 N.Y.S.2d 436, 438–39 (1998) [Evaluation of fiduciary duty between religious organization and parishioner impermissible under First Amendment.]. See generally, Anno., "Liability of Church or Religious Society For Sexual Misconduct of Clergy," 5 A.L.R.5th 530 (1992).

48. *Bladen v. First Presbyterian Church of Sallisaw*, 1993 OK 105, ¶ 12, 857 P.2d 789; *Hadnot v. Shaw*, 1992 OK 21, ¶ 30, 826 P.2d 978; *Guinn v. Church of Christ of Collinsville*, 1989 OK 8, ¶ 34, 775 P.2d 766;

ment—that broad First Amendment protection be given to protect sexual abusers of children. However, we are not asked in this cause to address the liability of the abuser. Rather, the issue of whether church officials, who did not perpetrate acts of childhood sexual abuse and who lacked knowledge that such acts were being committed, should be held liable is presented. Sexual abuse of children is a tragedy. Hard questions are presented because the Court is faced with strong public policy favoring the protection of children from sexual abuse.[49] At the same time, payment for that harm is sought not from the tortfeasor, but from others. Ultimately, the Court is determining potential liability of a third party for another person's intentional criminal conduct. As difficult as it may be to conclude that recovery will not be allowed, there is no principled basis for finding liability on the part of the national organization. We conclude that, under the facts presented—where the acts were clearly outside the scope of employment and the church officials lacked knowledge of the abuse—liability may not be imposed.

¶ 28 Summary judgment is proper only when the pleadings, affidavits, depositions, admissions or other evidentiary materials establish that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.[50] Although we do not reach the constitutional issue found dispositive by the trial court, the summary judgment ruling is affirmed.[51] Our holding is based on Oklahoma law which provides *bona fide*, separate, adequate and independent grounds for our decision.[52]

¶ 29 **AFFIRMED.**

**ALL JUSTICES CONCUR.**

---

49. See, 10 O.S. Supp.1998 § 7102, note 1, supra; 21 O.S. Supp.1995, §§ 1111 and 1123.

50. *Nail v. City of Henryetta*, 1996 OK 12, ¶ 14, 911 P.2d 914; *Carris v. John R. Thomas & Assoc.*, 1995 OK 33, ¶ 16, 896 P.2d 522; *Skinner v. Braum's Ice Cream Store*, 1995 OK 11, ¶ 9, 890 P.2d 922.

51. A trial court's decision will be affirmed if it reaches the correct result. *Davidson v. Gregory*, 1989 OK 87, ¶ 14, 780 P.2d 679; *Eckel v. Adair*, 1984 OK 86, ¶ 2, 698 P.2d 921.

52. *Michigan v. Long*, 463 U.S. 1032, 1042, 103 S.Ct. 3469, 3476, 77 L.Ed.2d 1201, 1214 (1983).