FILED
United States Court of Appeals
Tenth Circuit

September 27, 2012

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

RONALD L. HUNTLEY,

   Plaintiff-Appellant,

v.

CITY OF OWASSO, a municipal
corporation of the State of Oklahoma;
JAROD MITCHELL, an individual; TIM
HUTTON, an individual,

   Defendants–Appellees.

No. 11-5145
(D.C. No. 4:10-CV-00017-JHP-FHM)
(N.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **MATHESON**, Circuit Judge, **PORFILIO**, Senior Circuit Judge, and
**BALDOCK**, Circuit Judge.

Ronald L. Huntley appeals from the district court's grant of summary

judgment in favor of the defendants in his lawsuit under 42 U.S.C. § 1983 and

Oklahoma's Governmental Tort Claims Act, Okla. Stat. tit. 51, §§ 151-200.

---

 [*] After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel. It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm the grant of summary judgment on the § 1983 claims, but we vacate the grant of summary judgment on the state-law claims and remand for further proceedings.

## I. BACKGROUND

On March 31, 2009, Susan Huntley called 911 and reported that her husband Ronald had "just knocked [her] clear down . . . [r]ight in the throat." Aplt. App. Vol. 1 at 97. In response to the dispatcher's questions, she said that there were weapons in the house and that Mr. Huntley was still on the premises. The dispatcher advised officers that "the wife is saying he knocked her across the room and there are lots of weapons in the house. Suspect is now on the back porch." *Id.* at 99.

Owasso police officers Tim Hutton and Jarod Mitchell were the first to arrive at the Huntleys' home. Officer Mitchell's patrol car was equipped with an "ICOP" video and audio recording system. Although the dashboard-mounted camera was not pointed toward the house, the system also included a belt microphone that continued to record audio when Officer Mitchell left the car and approached the house.

The officers first tried the back gate and found it locked. They then went to the front entrance, a small porch with a front door protected by a storm door. The storm door was closed, but the front door was partially open. The Huntleys were inside, near the door. The officers heard Mr. Huntley say something to Mrs. Huntley

- 2 -

along the lines of, "I don't want you ever talking to (unintelligible)." Aplt. App. Vol. 1 at 102 (transcript).[1]

The officers ordered Mr. Huntley to come outside. The parties dispute exactly what happened next. Mr. Huntley contends that he attempted to comply with the order, but the officers did not give him the chance. Instead, Officer Mitchell knocked his book out of his hand, the officers grabbed him by the arms, and "they jerked [him] out the door." *Id.* at 270. As Mr. Huntley described it in his deposition,

> it felt like a bolt of lightning had hit me. It went up my arm to my neck and down my spine, and I was in a lot of pain. The next thing I knew, I was on the outside and somehow I had been thrown on my back or my stomach. I had been flipped somehow, but I don't remember how it was done.

*Id.* Mr. Huntley alleges that he suffered injuries to his back and neck from the officers' seizure and use of force.

For their part, the officers assert that Mr. Huntley started to close the front door and retreat into the house. Fearing a possible hostage situation, Officer Mitchell knocked the book out of Mr. Huntley's hand, grabbed his left arm, and applied an

---

[1] Mr. Huntley disputes that he made any such statement, but Mrs. Huntley was still on the phone with 911 when the officers arrived, and the statement can be heard on the 911 recording. Because the recording contradicts Mr. Huntley's denial of making a statement, he has not created a genuine issue of material fact regarding whether he said *something*. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). But it is not clear what Mr. Huntley said beyond what can actually be heard on the recording.

arm bar. Officer Hutton grabbed Mr. Huntley's right arm and together the officers pulled him through the doorway, across the porch, and into the front yard. They alleged that Mr. Huntley resisted by pulling backwards and struggling. Therefore, once they reached the yard, Officer Mitchell performed a leg sweep, causing Mr. Huntley to fall to the ground. It is undisputed that both officers kept hold of Mr. Huntley's arms as he fell.

Mr. Huntley was arrested. Initially he was charged with domestic abuse by strangulation, resisting arrest, and obstruction of an officer, but the charges later were modified to domestic assault and battery and obstructing an officer. Eventually Mrs. Huntley's noncooperation caused the charges to be dropped.

Mr. Huntley sued the officers and the City. His first claim, under the Oklahoma Governmental Tort Claims Act, alleged that (1) the officers had negligently restrained him, (2) the City was vicariously liable for that negligence, and (3) the City was negligent in hiring, training, and supervising the officers. His second claim, under § 1983, alleged that (1) the officers had used excessive force in violation of his rights under the Fourth, Eighth, and Fourteenth Amendments and (2) the City had been deliberately indifferent to the need for training, supervision, and discipline, thereby creating a policy or custom of allowing officers to violate constitutional rights.

Early in the litigation, Mr. Huntley voluntarily dismissed with prejudice his Eighth Amendment § 1983 claims and his negligence claims against the officers.

The defendants moved for summary judgment on his remaining claims.  The district court concluded that there were no constitutional violations because the entry into the Huntleys' home was justified by exigent circumstances, the officers had probable cause to arrest Mr. Huntley, and the officers' use of force was objectively reasonable. Accordingly, the district court held that the officers were entitled to qualified immunity.

In a footnote, the court also held that the City was entitled to summary judgment because the court had found no constitutional violation, Mr. Huntley had not supported his § 1983 claim for municipal liability, and Mr. Huntley had not established that the City was liable under the Governmental Tort Claims Act "because there was no injury proximately caused by the Defendant Officers."  Aplt. App. Vol. 2 at 588 n.1.

## II.  DISCUSSION

### A.  *Standard of Review*

"This court reviews the legal issues surrounding the grant of summary judgment based on qualified immunity de novo, considering all evidence in the light most favorable to the nonmoving parties . . . ."  *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1311 (10th Cir. 2002).  But "[b]ecause of the underlying purposes of qualified immunity, we review summary judgment orders deciding qualified immunity questions differently from other summary judgment decisions."  *Cortez v. McCauley*, 478 F.3d 1108, 1114 (10th Cir. 2007) (en banc) (internal quotation marks omitted).

"Once a defendant invokes the defense of qualified immunity, the plaintiff must meet a two-part burden to avoid summary judgment: (1) that the defendant's actions violated a constitutional or statutory right and (2) that the right was clearly established at the time of the defendant's unlawful conduct." *York v. City of Las Cruces*, 523 F.3d 1205, 1209 (10th Cir. 2008) (internal quotation marks omitted). The court may decide the appropriate order to consider these issues. *See Camreta v. Greene*, 131 S. Ct. 2020, 2031-32 (2011); *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

On appeal, Mr. Huntley focuses on his § 1983 excessive-force claim against the officers, and on his § 1983 claims and his state-law negligence claims against the City. Because he fails to challenge any other aspect of the district court's decision, including its conclusions that the officers' entry into his home was justified by exigent circumstances and that they had probable cause to arrest him, he has waived appellate review of such issues. *See Becker v. Kroll*, 494 F.3d 904, 913 n.6 (10th Cir. 2007).

B.    ***The Claim Against the Officers***

1.    ***The Objective Reasonableness Standard***

Like the district court, we begin by considering whether Mr. Huntley has established a violation of his constitutional rights. Claims of excessive force during an arrest are evaluated under the "objective reasonableness" standard set forth in *Graham v. Connor*, 490 U.S. 386 (1989). "[T]he question is whether the officers'

actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. "Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* at 396. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* Relevant factors include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

2. ***Was the Use of Force Objectively Reasonable?***

Before we analyze the *Graham* factors, we note that the entire incident, from the time the officers first spoke to Mr. Huntley to when they completed the leg sweep, took less than thirty seconds, which underscores the Supreme Court's caution about "tense, uncertain, and rapidly evolving" situations that require "split-second judgments." *Id.* at 397.

- 7 -

a.    *The* **Graham** *factors*

The first *Graham* factor focuses on the severity of the crime at issue. The officers were responding to a complaint of domestic violence. Under Oklahoma law, domestic abuse may be a misdemeanor or a felony, depending on the circumstances. *See* Okla. Stat. tit. 21, § 644. At the time of the incident, the officers did not know the severity of Mr. Huntley's conduct. Faced with a complaint of potentially felonious domestic violence, the officers find support from the first *Graham* factor.

The second *Graham* factor is whether the suspect posed a threat. The alleged domestic violence perpetrator remained on the scene. The officers were aware that the victim reported in her 911 call that there were "lots of weapons" in the house. Aplt. App. Vol. 1 at 99. In their training, the officers had been told that "domestic violence calls are among the most dangerous for officers to handle because of the emotionally unstable condition of the participants and the unpredictability of their behavior." *Id.* at 88, 93. Moreover, when the officers arrived, both the victim and the suspect were near the front door. The officers heard Mr. Huntley say something along the lines of "I don't want you ever talking to (unintelligible)." *Id.* at 102. The front porch and entryway area presented close confines, leaving the officers vulnerable. It was reasonable for the officers to believe that Mr. Huntley may present an immediate threat to the safety of Mrs. Huntley and possibly the officers themselves.

The third *Graham* factor is whether the suspect resisted arrest. Mr. Huntley argues that because he was "a compliant suspect," "any use of force was unnecessary and in violation of [his] clearly established Constitutional right to be free from excessive force." Aplt. Br. at 14. We separately consider the arm bar and the leg sweep.

### b. *The Arm Bar*

Mr. Huntley presented evidence that he tried to comply with the officers' demand to come outside, and that, contrary to the officers' account, he did not try to close the front door or try to retreat into the house. Therefore, in viewing the facts in the light most favorable to him, we must conclude that Mr. Huntley offered no resistance when the officers approached the house and commanded him to come outside.

But that does not resolve whether it was unreasonable for the officers to apply the arm bar. In *Cortez v. McCauley*, the en banc court addressed a situation where officers grabbed a suspect in his doorway. 478 F.3d at 1113, 1128. When the officers arrived at the suspect's house, the suspect opened the front door and asked officers what was going on. *Id.* at 1113. The officers asked him to exit the house. When he began to comply, they grabbed him, handcuffed him, and placed him in a patrol car. *Id.* Even though the suspect had offered no resistance and presented no immediate threat to the safety of the officers or others, the court had "little difficulty concluding that a small amount of force, like grabbing [the suspect] and placing him

in the patrol car, is permissible in effecting an arrest under the Fourth Amendment." *Id.* at 1128.

Mr. Huntley contends that the arm bar was no small amount of force; he described it as feeling "like a bolt of lightning" when the officers grabbed his arms, with pain going to his neck and to his spine. Aplt. App. Vol. 1 at 270. He further asserts that his evidence creates a genuine issue of material fact as to the amount of force used, precluding summary judgment. We disagree. There is no evidence that the officers performed the arm bar in any way other than they had been trained to do, or that they used force beyond what is commonly used for this maneuver.[2]

The officers' conduct in pulling Mr. Huntley through the doorway appears comparable to the grabbing in *Cortez*. Moreover, in *Cortez* this court found the use of force constitutional even though the alleged crime had not just occurred and the suspect presented no immediate threat to anyone's safety. As discussed above, the

---

[2] As to Mr. Huntley's complaints of pain, he points out that he had back surgery only a few months before the incident. "What would ordinarily be considered reasonable force does not become excessive force when the force aggravates (however severely) a pre-existing condition the extent of which was unknown to the officer at the time." *Rodriguez v. Farrell*, 280 F.3d 1341, 1353 (11th Cir. 2002); *cf. Fisher v. City of Las Cruces*, 584 F.3d 888, 896 (10th Cir. 2009) (concluding that a reasonable jury could find the use of force excessive where officers were made aware of the suspect's injuries, but "hasten[ing] to add this might be a very different case if the officers had no knowledge of [the suspect's] injuries"). There is no evidence that the officers were aware of Mr. Huntley's recent back surgery when they performed the arm bar or the leg sweep. Mr. Huntley's assertion in his opening brief that upon physical contact he "immediately . . . informed officers that he had had back surgery just three months prior," Aplt. Br. at 4, is not supported by the record, particularly the ICOP recording. Therefore, Mr. Huntley has not created a genuine issue of fact as to this matter. *See Scott*, 550 U.S. at 380.

- 10 -

circumstances here support some use of force.  We conclude that the district court did not err in deciding it was justifiable for the officers to apply the arm bar.

### *c.* ***The Leg Sweep***

At first glance, the leg sweep appears to be a closer question.  The evidence suggests that once the officers had Mr. Huntley in the arm bar, they had controlled him, indicating the leg sweep might have been unnecessary.  A close examination of the record, however, indicates that the district court did not err in concluding that the leg sweep was objectively reasonable.

As with the arm bar, Mr. Huntley argues that there is a genuine issue of material fact as to the amount of force used.  But again, there is no evidence that Officer Mitchell performed the leg sweep in any way other than he had been trained to do, or that he used any amount of force beyond that which is commonly used when performing that maneuver.  In fact, Mr. Huntley admitted in his deposition that he did not know exactly what happened regarding the leg sweep.  *See id.* at 117 (in response to the question "Do you remember how you got taken to the ground?," "No, I do not. I assume they knocked my feet out from under me, and I wound up on the ground."); *id.* at 118 (stating that he thought he landed on his back, but he was not sure); *id.* at 270 ("The next thing I knew, I was on the outside and somehow I had been thrown on my back or my stomach.  I had been flipped somehow, but I don't remember how it was done.").  Mr. Huntley also admitted that the officers kept hold of his arms as he went to the ground.  As with the arm bar, then, the question is whether the leg sweep

was objectively reasonable in the first instance, not whether it should have been performed with less force.

The officers testified that Mr. Huntley was struggling against their hold and pulling backward as they moved him to the yard. Resistance satisfies the third *Graham* factor, and this court has held that a forceful takedown is objectively reasonable when a suspect struggles with police. *See Gallegos v. City of Colo. Springs*, 114 F.3d 1024, 1031 (10th Cir. 1997); *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 781-82 (10th Cir. 1993). And even though we view the evidence in the light most favorable to Mr. Huntley, on this issue we must accept the officers' version of events because we have found nothing in the record to contradict the officers' assertions.

Mr. Huntley's arguments about his compliance with the officers' commands focus on his conduct inside the house. He has not pointed us to, and we have not found, any denial of the officers' assertions that he resisted after they applied the arm bar. In fact, the deposition excerpts quoted above indicate that he has no recollection of exactly what occurred in those few seconds.

In sum, as to the arm bar, the first and second *Graham* factors favor the officers' use of force, and the third factor does not preclude it. As to the leg sweep, all three *Graham* factors favor the officers' use of force. Therefore, the district court did not err in concluding that the officers' use of force was objectively reasonable.

We affirm the district court's grant of summary judgment based on qualified immunity to Officers Mitchell and Hutton.

### 3. *The Claims Against the City*

#### a. *Section 1983 Claims*

The district court granted summary judgment to the City on the § 1983 claims, among other reasons, because the officers had committed no constitutional violations. Inasmuch as we have affirmed that conclusion, we also affirm the district court's disposition of the § 1983 claims against the City. *See Trigalet v. City of Tulsa, Okla.*, 239 F.3d 1150, 1155-56 (10th Cir. 2001) ("[E]ven if it could be said that [the City's] policies, training, and supervision were unconstitutional, the City cannot be held liable where, as here, the officers did not commit a constitutional violation.").

#### b. *Negligence Claims*

That leaves the negligence claims. Mr. Huntley alleged that the City (1) was vicariously liable for the officers' negligence and (2) was liable for its own negligent hiring, training, and supervising of the officers. These claims were brought pursuant to the Oklahoma Governmental Tort Claims Act, which includes a limited waiver of Oklahoma's sovereign immunity against tort claims. With limited analysis, the district court held that "Plaintiff has failed to establish Defendant City's liability under the Governmental Tort Claims Act because there was no injury proximately caused by the Defendant Officers. *See Nicholson v. Tacker*, 512 P.2d 156 (Okla. 1973)." Aplt. App. Vol. 2 at 588 n.1.

The parties understand the district court's ruling differently. Mr. Huntley argues that this decision was incorrect because he presented evidence that the officers' use of force injured his neck and back and caused psychological impairments. He appears to read the district court's decision as saying there was no evidence of injury, period. By contrast, the appellees briefly assert that "the District Court properly determined Defendant Officers breached no duty of ordinary care and subsequently were not responsible for any injury to Mr. Huntley." Aplee. Br. at 27-28.

The key to understanding the district court's decision is its citation to *Nicholson*, which said:

> It is an established rule of law that there can be no actionable negligence where the defendant has breached no duty owed to the plaintiff. Just because the defendant has created a risk which harmed the plaintiff that does not mean that, in the absence of some duty to the plaintiff, the defendant will be held liable.

512 P.2d at 158. Accordingly, the City is correct that the determinative issue is whether the City adequately established that there was no breach of duty.

### 1. *Vicarious Liability*

To succeed on a theory of vicarious liability against the City, Mr. Huntley must show that the officers were negligent. *See Hooper ex rel. Hooper v. Clements Food Co.*, 694 P.2d 943, 945 (Okla. 1985). The Oklahoma Supreme Court has assumed, "without deciding, that a police officer owes a negligence-based duty of

- 14 -

care to an arrestee to protect the arrestee from injury." *Morales v. City of Okla. City*, 230 P.3d 869, 878 (Okla. 2010). The court went on to discuss the nature of this duty:

> [A] police officer has a special dispensation from the duty of ordinary care not to endanger others. **A police officer's duty is very specific: it is to use only such force in making an arrest as a reasonably prudent police officer would use in light of the objective circumstances confronting the officer at the time of the arrest.** . . . The question is whether the objective facts support the degree of force employed.

*Id.* at 880. The court then identified several factors that may be relevant to the analysis; the first three are the *Graham* factors, but the court also identified four additional factors and left room for other circumstances to be considered. *See id.* at 880 & n.48.

Neither party has ever cited *Morales*, identified the record evidence regarding the *Morales* factors, or otherwise argued how *Morales* applies to this case. Accordingly, neither this court nor the district court has had the benefit of suitable briefing or an adequate record to decide, under the applicable Oklahoma authority, whether the City has shown that the officers did not breach their duty of care. We must conclude that the grant of summary judgment on the vicarious liability claim was premature.

## 2. *Negligent Hiring, Training, and Supervision*

Mr. Huntley's complaint also alleged that the City was negligent in hiring, training, and supervising the officers.[3] In contrast to vicarious liability, these allegations focus on the City's own conduct. *See N.H. v. Presbyterian Church (U.S.A.)*, 998 P.2d 592, 600 (Okla. 1999). But for two reasons, these claims also are tied to the determination of the vicarious liability claim. First, they are "based on an employee's harm to a third party through employment." *Id.* So if the officers were not negligent, then the City would not be liable for negligent hiring, training, or supervision. Second, in Oklahoma these claims are available only when vicarious liability is *not* established. *See id.*; *Jordan v. Cates*, 935 P.2d 289, 293 (Okla. 1997). So if Mr. Huntley prevails, it will be either on vicarious liability or on these other negligence claims; it cannot be on both. All of Mr. Huntley's negligence claims against the City must therefore be remanded.

\* \* \*

For these reasons, we must vacate the grant of summary judgment to the City on Mr. Huntley's negligence claims and remand for further proceedings. On remand, the district court may consider whether its further examination of the negligence claims is merited in light of the values of judicial economy, convenience, fairness,

---

[3] It appears that in his summary judgment briefing, Mr. Huntley focused on negligent supervision; he barely mentioned negligent training and did not mention negligent hiring at all. He may have abandoned his claims of negligent training and hiring, but we will leave it to the district court to identify the negligence claims on remand.

and comity, or whether it would be more suitable for those claims to be addressed by an Oklahoma court.[4] *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988); *see also* 28 U.S.C. § 1367(c).

### III.   **CONCLUSION**

We affirm summary judgment in favor of the officers and the City on Mr. Huntley's § 1983 claims, but we vacate the grant of summary judgment in favor of the City on Mr. Huntley's negligence claims and remand for further proceedings.

ENTERED FOR THE COURT


Scott M. Matheson, Jr.
Circuit Judge

---

[4] In *Green v. Board of County Commissioners*, 472 F.3d 794, 801 n.2 (10th Cir. 2007), we were concerned that a Governmental Tort Claims Act claim might be time-barred if it were dismissed by the federal court because the Oklahoma Court of Appeals had held that the Oklahoma savings statute, Okla. Stat. tit. 12, § 100, was inapplicable to such claims. But after those state appeals-court decisions, the Oklahoma Supreme Court made it clear that claims under the Governmental Tort Claims Act are not excepted from § 100's reach, *see Cruse v. Bd. of Cnty. Comm'rs*, 910 P.2d 998, 1005 (Okla. 1995), which should have alleviated the concerns in *Green*.