**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 10, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

J.M., a minor, by and through her
parents and next friends; THOMAS and
REBECCA MORRIS,

        Plaintiffs - Appellees/
        Cross-Appellants,

    v.

HILLDALE INDEPENDENT SCHOOL
DISTRICT NO. 1-29, of Muskogee
County, Oklahoma, also known as
Hilldale Public Schools,

        Defendant - Appellant/
        Cross-Appellee,

and

BRIAN GIACOMO,

        Defendant/Cross-Appellee.

Nos. 08-7104 & 08-7105

(E.D. Oklahoma)

(D.C. No. 6:07-CV-00367-JHP)

**ORDER AND JUDGMENT**[*]

Before **MURPHY** and **HOLMES**, Circuit Judges, and **ARMIJO**,[**] District Judge.

---

[*]This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

[**]The Honorable M. Christina Armijo, United States District Judge for the
District of New Mexico, sitting by designation.

## I.    Introduction

Defendant-Appellant Hilldale Independent School District (Hilldale) appeals the district court's denial of its motion for judgment as a matter of law. It further challenges selected evidentiary rulings, the basis for permitting certain legal theories to go to the jury, the entry of inconsistent verdicts, and the plaintiff's perceived double recovery. Plaintiff-Appellee and Cross-Appellant, J.M. by and through her parents and next friends, Thomas and Rebecca Morris, (J.M.) contends that the district court improperly reduced the jury's verdict. We exercise jurisdiction under 28 U.S.C. §1291 and **AFFIRM** the district court.

## II.    Factual Background

During the course of 2005-2006 school year and through November 2006, Brian Giacomo, a high school band teacher, and J.M., a student, maintained an inappropriate relationship, which included kissing, hugging, petting, and vaginal and oral sex. The activities occurred on and off school property. In April 2006, after the sexual relationship began, Giacomo took the Hilldale band, of which J.M. was a member, on an out of state trip to St. Louis, Missouri. During that trip, another band member, Mikel Pembrook, knocked on the closed door of Giacomo's hotel room to inquire about dinner plans. When Giacomo opened the door, Pembrook observed J.M. lying on the bed.

After the band trip, J.M. received an award for being the most improved band student. Pembrook was unhappy that J.M. received the award and initiated a confrontation. Pembrook called J.M. a "slut" and attributed the award to her relationship with her "pedophile boyfriend." J.M. reported the confrontation to Giacomo, who arranged for Pembrook to meet with Assistant Principal, Darren Riddle. Giacomo also attended the meeting. During the meeting, Pembrook told Riddle that he thought Giacomo was a pedophile and that he saw Giacomo alone in a hotel room with a female student. Pembrook testified, and Giacomo corroborated, that Riddle became hostile to Pembrook during the conversation. Riddle then arranged to meet with Pembrook's parents, and according to J.M., threatened Pembrook's parents that if the "pedophile rumors" did not stop, Pembrook would be suspended or expelled. Following the meeting with Pembrook's parents, Riddle recommended to D.B. Merrill, the school superintendent, that he deny Pembrook's transfer, which allowed him to attend Hilldale even though he lived in another district. According to J.M., the transfer was denied in part because of Pembrook's report of Giacomo's conduct to Riddle.

Riddle testified that he also passed the information on to the principal, Gary Pemberton. It appears that nothing further happened, however, until November 2006, when the parents of another female student, S.R., alerted the Hilldale officials to evidence that they had discovered, which indicated an inappropriate relationship between their daughter and Giacomo. Hilldale

suspended Giacomo, and he resigned the next day. At that point, Hilldale began to investigate Giacomo. After a parent's meeting, J.M.'s mother initiated a discussion with J.M., who admitted to her relationship with Giacomo. J.M.'s family moved to another school district. J.M. sought treatment with a psychiatrist and was diagnosed with post-traumatic stress disorder and major depressive disorder. She was prescribed antidepressant and anti-anxiety medications.

On November 2, 2007, J.M. filed suit against Hilldale and Giacomo for violations of Title IX, § 1983, and common law negligence. Hilldale filed a motion for summary judgment, which was denied by the district court. The case went to trial before a jury in August 2008. The jury returned verdicts in J.M.'s favor on the Title IX claim, two § 1983 claims, and the negligence claim, and the jury found in favor of Hilldale on a third § 1983 claim and a second negligence claim. The jury awarded J.M. $150,000 in damages on each claim for a total of $600,000 against Hilldale. In addition, the jury awarded damages against Giacomo for assault, battery, and intentional infliction of emotional distress, for a total of $1,900,000 and an additional $500,000 in punitive damages. After considering a motion from Hilldale, the district court eliminated one of the $150,000 verdicts, finding that the two § 1983 claims were duplicative, and also reduced the state tort verdict from $150,000 to $125,000 to reflect a statutory cap on damages. Hilldale appeals and J.M. cross appeals from the jury's verdicts and the district court's rulings.

## III.   Discussion

Hilldale raises four issues.  First, Hilldale argues that the district court erred by denying Hilldale's motion for judgment as a matter of law with respect to the Title IX claim, the § 1983 inaction claim, and the state tort claims.  Related to the Title IX claim, Hilldale contends that the district court improperly excluded J.M.'s diary and evidence of her prior sexual history, and as a result of the exclusion, Hilldale was unable to disprove one of the elements of the Title IX claim.  Second, Hilldale contends for the first time on appeal that the district court wrongly permitted the § 1983 danger creation theory to go to the jury.  Finally, Hilldale maintains that the district court entered irreconcilably inconsistent verdicts and fourth, that the judgment permitted double recovery. In her cross appeal, J.M. contends that the district court improperly reduced the jury's award when it determined that two of the verdicts were duplicative.

In addition to the issues presented in this appeal, two motions remain outstanding before this Court:  Hilldale has moved to supplement the record and has moved to file portions of the record under seal.  Both motions were provisionally granted and reserved for final ruling by this panel.  We first address Hilldale's outstanding motion relating to the adequacy of the designated record. Hilldale has challenged the evidence to support the verdict but filed only excerpts of the trial transcript, contrary to 10th Cir. Rule 10.1.(A)(1)(a).  Arguing that the failure to file the entire transcript was a good faith error, Hilldale requests

permission to supplement the record with the entire transcript. J.M. responds that dismissal of the substantial evidence appeal is required because the error was not in good faith and supplementation of the record would prejudice J.M.

The cases cited by J.M. do not suggest that a motion to supplement the record should be automatically denied and a substantial evidence appeal should be immediately dismissed. Instead, Quarles v. Spess Oil Co., Inc., No. 08-5058, 2009 WL 319624 (10th Cir. Feb. 10, 2009), considered an appeal where no motion to supplement the inadequate record was filed. The Court therefore admonished that "[o]nce again, it is incumbent upon us to remind litigants that we regularly decline to hear claims that are premised upon record evidence that is not included in the appendix." Id. at *3. In Blackwell v. SKO Mgmt., Inc., 64 Fed.Appx. 725 (10th Cir. 2003), the plaintiff challenged the sufficiency of the evidence and failed to provide a transcript. Id. at *1. He filed a motion to supplement the appendix but only offered portions of the transcript as supplementation. Id. The Court denied the motion to supplement and rejected the Plaintiff's sufficiency argument. Id. at * 1-2. Finally, in Roberts v. Roadway Exp., Inc, 149 F.3d 1098 (10th Cir. 1998), the Court refused to consider a sufficiency claim because only excerpts of the transcript were provided, but the case did not apparently address a motion to supplement the appendix. Id. at 1004-05.

In the present case, Hilldale argues that it failed to provide a full transcript in good faith and accordingly filed a motion to place the entire transcript in the appendix. Based on the motion to supplement, Hilldale does not expect the Court to consider its sufficiency claim without the full transcript, as did the appellant in Quarles. Nor has Hilldale offered to supplement only with excerpts of the transcript as was the case in Blackwell and Roberts. As a result, it appears to be a good faith error. The motion to supplement and consider the entire transcript is granted.

Hilldale has also filed a second motion, requesting that its briefs and appendix be filed under seal due to references to J.M.'s prior sexual history, as well as the excerpts from her diary. It does not appear that J.M. opposes this motion, and it is hereby granted. We now turn to Hilldale's appeal.

## A. Sufficiency of the Evidence

After the jury returned its verdict, Hilldale filed a motion for judgment as a matter of law and argued that the jury did not have sufficient evidence to find for J.M. on the Title IX, § 1983, and state tort claims. The district court denied these claims, simply stating that these issues were previously addressed by the Court. Aplt.App., Vol. I, at 249. Presumably, the district court was referring to its earlier order, which denied Hilldale summary judgment on these issues. Aplt.App., Vol. I, at 23. We address each argument in turn.

This Court reviews the "denial of a motion for judgment as a matter of law de novo, taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to . . . the non-movant." N. Am. Specialty Ins. Co. v. Britt Paulk Ins. Agency, Inc., 579 F.3d 1106, 1111 (10th Cir. 2009). "Judgment as a matter of law is appropriate only if the evidence points but one way and is susceptible to no reasonable inferences which may support the nonmoving party's position." Id. (internal quotation marks and citation omitted). Further, "[j]udgment as a matter of law is appropriate only when the evidence presented at trial does not permit a reasonable jury to find for the non-movant." Manzanares v. Higdon, 575 F.3d 1135, 1142 (10th Cir. 2009). We do "not weigh evidence, judge witness credibility, or challenge the factual conclusions of the jury." Id. (internal quotation marks and citation omitted).

1.    **Title IX**

"Title IX prohibits sex discrimination by recipients of federal education funding[; the] statute provides that '[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.'" Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 173 (2005) (quoting 20 U.S.C. § 1681I(a)). Title IX implies a private right of action for monetary damages to enforce its prohibition of intentional sex

discrimination "in the form of a recipient's deliberate indifference to a teacher's sexual harassment of a student." Id.

A damages remedy, however, will not lie under Title IX "unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond." Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290 (1998). The failure to respond to discrimination, in turn, must amount to "deliberate indifference," or "an official decision . . . not to remedy the violation." Id. This is because "[u]nder a lower standard, there would be a risk that the recipient would be liable in damages not for its own official decision but instead for its employees' independent actions." Id. at 290-91. In Davis v. Monroe County Bd. of Educ., 526 U.S. 629 (1999), the Supreme Court further clarified the elements of a Title IX action: (1) an official is deliberately indifferent to sexual harassment (2) of which there was actual knowledge; (3) and the harassment "is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." Id. at 650. Hilldale argues that (1) it did not have actual knowledge of the harassment, (2) its response was not clearly unreasonable and therefore did not amount to deliberate indifference, and (3) it was prevented by the district court's evidentiary

ruling from showing that the harassment did not deprive J.M. of access to education.

**a.      Actual Knowledge**

Hilldale contends that the only evidence of actual knowledge was Pembrook's report to Riddle regarding J.M.'s presence in Giacomo's hotel room in St. Louis.  Citing Gebser and Escue v. N. Oklahoma College, 450 F.3d 1146 (10th Cir. 2006), Hilldale argues that this evidence is insufficient to establish actual knowledge.  In Gebser, the Supreme Court concluded that a school district did not have actual knowledge because the information available was a complaint from the parents of a student who was not the plaintiff, charging that the teacher in question had made inappropriate comments during class.  524 U.S. at 291.  The report was "plainly insufficient to alert the principal to the possibility that [the teacher] was involved in a sexual relationship with a student."  Id.  In Escue, a university had information that the professor in question had dated two students who were near his own age and that nearly a decade before the events about which the plaintiff sued, the professor had been accused of a single incident of inappropriate touching and a single incident of inappropriate name calling.  450 F.3d at 1154.  These prior incidents, this Court concluded, did not provide the college with "actual knowledge that [the teacher] presented a 'substantial risk of abuse' to other students—indeed, one of the incidents involved no physical contact whatsoever, the other was an isolated incident, and neither involved

-10-

anywhere near the degree of overt and pervasive harassment that [the plaintiff] alleges constituted a hostile educational environment." Id.

In Gebser, the complaint received by school officials was of a different type than the ultimate misconduct: the parents complained of inappropriate comments during class and the basis for the Title IX suit was a sexual relationship with a student. Similarly, in Escue, the prior complaints were stale and of a significantly different nature than those later made by the plaintiff. Both Gebser and Escue concluded that from the types of complaints made, the eventual alleged conduct could not have been anticipated—that the officials could not be deemed to have knowledge of a risk that the teacher would sexually harass the plaintiff who later filed suit. In the present case, the conduct that was reported as it related to a young high school student having a sexual relationship with a teacher—if the report was sufficient, as we discuss in subsequent paragraphs—was the same conduct that was eventually unearthed and to which J.M. and Giacomo admitted. We view Gebser and Escue to be of little avail to Hilldale.

At trial, the parties offered a great deal of conflicting testimony regarding the report made by Pembrook in May 2006.

i. **Riddle's Trial Testimony**

Riddle testified first. He explained that Pembrook simply reported that during a band trip to St. Louis, Giacomo and J.M. were seen in a motel room together, with the door propped open. Aplt.Supp.App., Vol. I, at 18, 86, 88.

-11-

According to Riddle, Pembrook stated that J.M. was sitting on the bed, Giacomo was standing nearby, and they were talking. Aplt.Supp.App., Vol. I, at 88. Riddle further testified that he stopped his investigation of Pembrook's report when Pembrook recanted the story and admitted to Riddle that he had been lying. Aplt.Supp.App., Vol. I, at 31. Specifically, Riddle stated that Pembrook made the report because he was upset that J.M. was getting attention and favoritism in band. Aplt.Supp.App., Vol. I, at 87. Finally, Riddle testified that he discussed Pembrook's report with D.B. Merrill, the district superintendent, in the context of whether to permit Pembrook to remain as a transfer student in the Hilldale district. Aplt.Supp.App., Vol. I, at 137-38.

## ii.    Merrill's Trial Testimony

Merrill disputed this, stating that he was not aware of any allegations against Giacomo until November 2006. Aplt.Supp.App., Vol. 1, at 161-62. Regarding Pembrook's transfer request, Merrill testified that Riddle reported only that Pembrook had made false accusations—that he had been untruthful—and not that Pembrook had made allegations of sexual misconduct. Aplt.Supp.App., Vol. I, at 162. Further, Merrill testified that he was under the impression, based on Riddle's report, that Pembrook reported to Riddle that the motel room door was open. Aplt.Supp.App., Vol. I, at 172, 184-85.

### iii.     Pemberton's Trial Testimony

Pemberton, the principal, testified to a different set of events.  Pemberton stated that in May 2006, Pembrook made a comment that "a young lady had been in a motel room with Mr. Giacomo with the door closed."  Aplt.Supp.App., Vol. II, at 234; see Aplt.Supp.App., Vol. II, at 509.  Importantly, Pemberton testified that Riddle informed him in May about the situation and that Pembrook was claiming to have seen J.M. and Giacomo in a motel room, with the door closed.  Aplt.Supp.App., Vol. II, at 512.  Riddle assured Pemberton that he had investigated the situation and talked to all of the students who had gone on the trip.  Aplt.Supp.App., Vol. II, at 234.  In addition, Riddle told Pemberton that the incident had been completely fabricated, that the girl was never alone in a room with Giacomo and that a number of kids were in the room watching television and talking.  Id.  Specifically, Riddle told Pemberton that "there was never a time that he was aware of through his investigation that there was a female in the room alone with the door open or closed."  Aplt.Supp.App., Vol. II, at 236.  Later, after Giacomo resigned, Riddle came to Pemberton's office and told Pemberton that he in fact had not investigated Pembrook's allegations, that he did not talk to everyone that was on the trip.  Aplt.Supp.App., Vol. II, at 254.  Riddle told Pemberton that back in May, he was "just convinced that nothing happened."  Id.

### iv.    Pembrook's Trial Testimony

Pembrook testified about what he witnessed in St. Louis and about his later report of the incident.  He explained that when he went to Giacomo's motel room door, it was closed, and after he knocked and Giacomo opened the door, Pembrook saw J.M. lying on the bed.  Aplt.Supp.App., Vol. II, at 446.  During the trial, Pembrook admitted that he could not remember what he told Riddle in May, but it was established that the word "pedophile" was used during the meetings and that Pembrook told Riddle that J.M. was the student who was in the motel room with Giacomo.  Aplt.Supp.App., Vol. II, at 452, 453-54, 469.  Pembrook, however, also testified that he did not tell Riddle that the motel room door was closed.  Aplt.Supp.App., Vol. II, at 460.  In addition, Pembrook denied having recanted the story at any time.  Aplt.Supp.App., Vol. II, at 462.  While Pembrook's testimony was confusing and at times contradictory, near the end of his examination he explained that he was "very nervous about this" and that "[t]he presence of people [made him] a little more nervous" than when he gave his deposition.  Aplt.Supp.App., Vol. II, at 496.

### v.    Giacomo's Trial Testimony

Finally, Giacomo testified.  He would not explain the events that occurred in St. Louis, Aplt.Supp.App., Vol. III, at 657, but he did state that he took Pembrook to Riddle's office for discipline after Pembrook called J.M. a slut and referred to Giacomo as her "pedophile boyfriend."  Aplt.Supp.App., Vol. III, at

656-57. Giacomo was certain the word pedophile was used during the meeting between himself, Pembrook, and Riddle. Aplt.Supp.App., Vol. III, at 657. Giacomo also confirmed Riddle's statement that Riddle informed Merrill about Pembrook's allegations. Aplt.Supp.App., Vol. III, at 677. In addition, Giacomo testified that Riddle did not question him at all about Pembrook's allegations—Riddle asked Giacomo no questions in May 2006. Aplt.Supp.App., Vol. III, at 744.

Review of the testimony demonstrates that the question of actual knowledge in this case was truly a question of fact for the jury. The jury was required to determine whether Pembrook, Riddle, Merrill, Giacomo, or Pemberton testified credibly about the contents of Pembrook's May 2006 Report. The verdict indicates that the jury credited the principal, Pemberton: that Riddle initially reported to him in May that Pembrook alleged that Giacomo and a student were together in a hotel room with the door closed.[1]

Although "Gebser makes clear that actual notice requires more than a simple report of inappropriate conduct by a teacher . . . the actual notice standard does not set the bar so high that a school district is not put on notice until it receives a clearly credible report of sexual abuse from the plaintiff-student."

---

[1] Although Pembrook testified at trial that he did not tell Riddle that the door was closed, the jury could have reasonably concluded that at the time of trial, Pembrook either didn't remember, he was nervous (as he stated during his testimony), or he was distracted by the fact that he was shipping off the next day to begin his Army career. Aplt.Supp.App., Vol. II, at 443.

Escue, 450 F.3d at 1154 (alteration in original) (internal quotation marks and citation omitted). Thus, Hilldale's assertions—that Riddle did not believe Pembrook's allegations—are insufficient alone to establish that the district did not have actual notice. Rather, because Pemberton testified that he received information from Riddle that a teacher had been in a motel room behind a closed door with a student and that Pembrook accused Giacomo of being a pedophile, the jury could reasonably have concluded that Pembrook's May 2006 report was sufficient to provide Riddle and Pemberton, and thereby Hilldale, with actual knowledge of an inappropriate sexual relationship between J.M. and Giacomo. See Gebser, 524 U.S. at 291 (requiring sufficient information "to alert the principal to the possibility that [the teacher] was involved in a sexual relationship with a student").

b.    **Deliberate Indifference**

Turning to the next prong of the analysis, deliberate indifference exists where the response "to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." Davis, 526 U.S. at 648. The Supreme Court of the United States has made clear that "[i]n an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not clearly unreasonable as a matter of law." Id. at 649 (internal quotation marks and citation omitted). Hilldale contends that J.M. cannot establish that Riddle's response to Pembrook's

-16-

report was unreasonable because Riddle and other adults did not find Pembrook to be credible. Specifically, Hilldale asserts that both "Riddle and [Pembrook]'s mother concluded that [Pembrook]'s statements about what he saw on the St. Louis band trip did not support his assertion that Giacomo was a pedophile." Therefore, Hilldale argues, the "jury may have believed that Riddle was inept, erroneous, or even negligent, but they could not fairly have concluded that he was deliberately indifferent." See Doe v. Dallas Indep. Sch. Dist., 153 F.3d 211, 219 (5th Cir. 1998).

Hilldale relies in part on Doe. In that case, the Fifth Circuit considered whether a school principal—who met with a complaining student, his mother, and the teacher and determined that the allegations of sexual harassment were not true—was deliberately indifferent for failing to further investigate the teacher. Id. at 219. The Court concluded that "[t]he fact that [the principal] misread the situation and made a tragic error in judgment does not create a genuine issue of material fact as to whether she acted with deliberate indifference toward [the student's] constitutional rights." Id. Hilldale likens Doe to the present case where Riddle met with Pembrook, a student who reported allegations of a teacher engaging in improper conduct with another student, and took no further action after determining that Pembrook's report was not credible. In the present case, however, Riddle took no steps to determine the credibility of the report— there was testimony at trial that although Pembrook identified J.M. as the student

-17-

involved, Riddle did not speak to her or her parents, nor did he question Giacomo about the incident.  Aplt.Supp.App., Vol. I, at 22 (Riddle did not call J.M.'s parents), Aplt.Supp.App., Vol. I, at 43 (Riddle did not speak with J.M.); Aplt.Supp.App., Vol. II, at 470 (Pembrook identified J.M.); Aplt.Supp.App., Vol. III, at744 (Giacomo was not questioned).  Unlike the principal in <u>Doe</u>, Riddle took no action at all to investigate the allegations.  Instead, the testimony supported a conclusion that Riddle informed Merrill of Pembrook's allegations and recommended that Pembrook—who was not a resident of the Hilldale school district and only attended Hilldale by permission—be removed from the transfer list and thereby not permitted to attend school in the Hilldale district. Aplt.Supp.App., Vol. I, at 137.  Ultimately, Pembrook's transfer request was denied.  Aplt.Supp.App., Vol. I, at 162.

Hilldale also cites <u>Gordon ex rel. Gordon v. Ottawa Cmty. Sch. Dist.</u>, 115 F.Supp.2d 1077 (S.D. Iowa 2000), for the proposition that a court "must examine the adequacy of the response, in light of the seriousness and credibility of the complaint that puts school officials on notice."  <u>Id.</u> at 1082-83 (internal quotation marks and citations omitted).  Thus, Hilldale argues, "Riddle's assessment of [Pembrook]'s credibility is fundamental to the issue of whether [Riddle] acted with deliberate indifference."  The Court, in <u>Gordon</u>, weighed a number of factors in "assessing" the official response to a report of sexual harassment.  <u>See id.</u> at 1083.  The school official spoke with the alleged victim's parents and the alleged

perpetrator and the official worked out an arrangement with the victim's mother regarding the perpetrator's presence on school property. Id. J.M. presented evidence that Riddle summarily dismissed Pembrook's report, without any assessment of the plausibility of the circumstances and without any investigation. While Pembrook's credibility is certainly relevant, see Gordon, Hilldale can point to no authority which would support a holding that Riddle's subjective assessment of Pembrook's credibility, standing alone, constituted a sufficient investigation in light of the facts reported to him by Pembrook. In other words, it is the substance of the report, independent from the perceived lack of credibility of the informant, that was sufficient to raise the flag that begged for an investigation of a report of a minor student being present in a closed motel room with her teacher. Riddle's snap conclusion that Pembrook was not to be believed could not operate to obviate the need for an investigation.

"Although no particular response is required, and although the school district is not required to eradicate all sexual harassment, the school district must respond and must do so reasonably in light of the known circumstances." Vance v. Spencer County Public Sch. Dist., 231 F.3d 253, 260-61 (6th Cir. 2000). As the district court pointed out, it was undisputed that after Pembrook's report, no school official conducted any investigation of Giacomo. Aplt.Supp.App., Vol. II, at 234-35. Riddle did not confront Giacomo or question any students apart from Pembrook. See Doe v. School Admin. Dist. No. 19, 66 F.Supp.2d 57, 64 (D.Me.

1999) (concluding that a jury could find unreasonable a principal's failure to question the teacher or other students about allegations that the teacher was having sexual relations with a student). A reasonable jury could have concluded that such a lack of response, given the information that Pembrook provided and Riddle's reaction, was not reasonable.

### c. Access to Education

Hilldale's third argument, related to whether the harassment affected J.M.'s access to education, is tied to its evidentiary argument. Prior to trial, J.M. filed a motion in limine to exclude evidence of her journal and her prior sexual behavior. Hilldale filed motions pursuant to Fed. R. Evid. 412(c), which outlines the procedure for determining the admissibility of evidence relating to the victim in sex offense cases. The district court granted J.M.'s motion and excluded the evidence. On appeal, Hilldale argues that the evidence that was excluded was the proof necessary to establish that the sexual harassment did not deprive J.M. of educational opportunities.

Under Fed. R. Evid. 412(a)(1) "[e]vidence offered to prove that any alleged victim engaged in other sexual behavior" is generally not admissible in "any civil or criminal proceeding" unless an exception applies. In civil cases, the exception permits the evidence if it is "otherwise admissible under these rules and its probative value substantially outweighs the danger of harm to any victim and of unfair prejudice to any party." Fed. R. Evid. 412(b)(2). Although it initially

appears that the journal and J.M.'s history are probative, we agree with the district court that the journal and J.M.'s prior sexual behavior is not admissible under the current circumstances.

Hilldale relies on Chancellor v. Pottsgrove Sch. Dist., 529 F.Supp.2d 571 (E.D.Pa. 2008), in support of its theory that because J.M. consented to the sexual relationship, Giacomo's sexual harassment was not so severe as to deprive her of educational opportunities. In that case, a student engaged in a sexual relationship with her band teacher and then subsequently sued under Title IX. Id. at 574. The district court permitted evidence that the student consented to the sexual relationship because although there was no question that a sexual relationship between a student and a teacher constituted harassment, the student's "voluntary participation in sexual activity with [the teacher was] admissible for purposes of determining whether the harassment rose to the level of 'severe, pervasive, and objectively offensive.'" Id. at 576 (quoting Davis, 526 U.S. at 650.)

Chancellor, however, is distinguishable on two grounds. J.M. does not dispute that the relationship was voluntary and the evidence from the journals would therefore be cumulative. Further, Chancellor does not address the admissibility of a student's prior sexual history—the case speaks only to the consensual nature of the relationship between the student and the teacher against whom the complaint is lodged. Rule 412(b)(2) governs prior sexual history.

The probative value of evidence concerning J.M.'s sexual history with other partners is limited given the evidence that J.M. presented to establish that she was denied access to education. For example, J.M. presented testimony that she was ostracized by other students after Giacomo resigned. Aplt.Supp.App., Vol. III, at 580. She was placed on antidepressants and anti-anxiety medication. Aplt.Supp.App., Vol. III, at 589. Her family felt it necessary to move to another school district. Aplt.Supp.App., Vol. III, at 574. Even in the new school, J.M. continued to be afraid of the teachers and couldn't motivate herself to study. Aplt.Supp.App., Vol. III, at 637. All of these negative impacts on J.M.'s education resulted directly from the sexual relationship with Giacomo—regardless of any previous sexual relationships J.M. might have had and despite the fact that Giacomo did not apply force. The journal and J.M.'s sexual history would not have been probative on the question of access to education and would simply have painted J.M. in a negative light.

Given the sensitive nature of the evidence and J.M.'s age, the district court did not abuse its discretion by excluding the evidence of J.M.'s prior sexual history. See Curtis v. Okla. City Pub. Sch. Bd. of Educ., 147 F.3d 1200, 1217 (10th Cir. 1998) (reviewing evidentiary rulings for abuse of discretion); Saffa v. Okla. Oncology, Inc., 405 F.Supp.2d 1280,1285 (N.D. Okla. 2005) (concluding that the fact of a prior consensual workplace relationship was not probative of whether the plaintiff was offended by the defendant's advances).

**2.      § 1983—Hilldale's Investigative Policy**

Hilldale contends that the district court improperly denied its motion for judgment as a matter of law on J.M.'s § 1983 claim that Hilldale had a policy of failing to investigate sexual harassment.

> A claim of municipal liability for sexual harassment requires that the state employee's discriminatory conduct be representative of an official policy or custom of the institution or are taken by an official with final policymaking authority. In the absence of an official policy, a municipality may still be liable for the widespread and persistent practice of sexual harassment which constitutes a custom.

Rost v. K.C. Steamboat Springs RE-2 Sch. Dist., 511 F.3d 1114, 1124-25 (10th Cir. 2008) (internal citations omitted). J.M. argues that Hilldale maintained a custom or practice of not investigating allegations of sexual harassment against students. In order to demonstrate this, J.M. had to prove (1) that Hilldale engaged in a "continuing, widespread, and persistent pattern of misconduct;" (2) that after notice of the conduct, policy-making officials demonstrated "deliberate indifference to or tacit authorization of the conduct;" and (3) that injury resulted to J.M. as a result of the conduct. Id. at 1125. Hilldale argues that J.M. did not provide evidence of either a pattern of misconduct or the deliberate indifference of a policymaker. The district contends that because Giacomo and J.M. tried to keep their activities secret, there was no evidence that any teacher or administrator knew of a "continuing, widespread, and persistent pattern of misconduct." J.M. responds that Hilldale had no implemented policy of

investigating sexual harassment claims. The school's written policy required the superintendent, Merrill, to investigate. Aplt.Supp.App., Vol. IV, at 2043. But Merrill testified that he delegated this responsibility to the school principals. Aplt.Supp.App., Vol. I, at 155. To complete the confusion, the principal, Pemberton, testified that it was Riddle's duty to investigate and Riddle testified that it was Merrill's obligation. Aplt.Supp.App., Vol. I, at 65 (Riddle); Aplt.Supp.App., Vol. II, at 243-44 (Pemberton). As the district court concluded in its order denying summary judgment to Hilldale, "a trier of fact could determine that the practice and custom was that ultimately, there was no one in charge of investigating complaints of sexual abuse." Aplt.App., Vol. I, at 68.

Hilldale argues that although Riddle chose not to act on Pembrook's allegations, because Riddle was not a policy maker, any deliberate indifference on his part does not subject Hilldale to § 1983 liability. Regardless of Riddle's status as a policy maker, J.M. points to evidence that Riddle passed on Pembrook's intelligence to Merrill, the superintendent, who also took no action. Aplt.Supp.App., Vol. I, at 137-38. In response, Hilldale offers authorities holding that under Oklahoma law, only school board members are final policy makers. For this proposition, it cites Curtis and Jantz v. Muci, 976 F.2d 623 (10th Cir. 1992) . However, Curtis was a wrongful discharge case in which this Court noted in passing that a school board was "the final policy-making authority under state law." Id., 147 F.3d at 1216; see Jantz, 974 F.2d at 630-31 (holding in a wrongful

discharge case that only the school board possessed the authority under state law to hire teachers). The Curtis opinion does not discuss the final policy-making authority of a school superintendent who is authorized under the written school policy to implement the sexual harassment policy. Merrill testified that he is the CEO of the school district, and according to the policy itself, he had the authority to implement the investigative rules. Aplt.Supp.App., Vol. I, at 153; Aplt.Supp.App., Vol. IV, at 2043. It further appears from the district court's order that Hilldale did not challenge the "official policy maker" element of the § 1983 claim because the court did not address the issue in the order on summary judgment or any other order in the record provided by Hilldale.

### 3. State Tort Claims

In its final argument relating to the district court's denial of the motion for judgment as a matter of law, Hilldale argues that there was insufficient evidence to support a state law tort claim for negligent supervision. In Oklahoma, an employer may be held liable for negligent supervision where "at the critical time of the tortious incident[,] the employer had reason to believe that the person would create an undue risk of harm to others." Escue, 450 F.3d at 1156. Hilldale essentially contends that because there was no evidence of actual knowledge to support the Title IX claim, there is no evidence that the district would have had reason to believe that Giacomo created an undue risk of harm to students. See id. ("[T]his element of the Oklahoma tort of negligent supervision largely overlaps

-25-

with the 'actual knowledge' prong of Title IX liability."). Based on our earlier analysis, Hilldale had reason to believe that Giacomo could create a risk of harm to students after Pembrook met with Riddle and Riddle reported to Merrill.

Hilldale further claims that because it had no prior notice of Giacomo's "propensities," it has no liability under state law. To support this requirement, Hilldale cites N.H. v. Presbyterian Church (U.S.A.), 1999 OK 88, 998 P.2d 592 (Okla. 1999). N.H., however, does not require that a school district have both a reason to believe an employee will create an undue risk of harm *and* prior notice of propensities. Rather, the Oklahoma Supreme Court equates prior notice with "reason to believe." Id. ¶ 20, 998 P.2d at 600. Indeed, this makes sense: it is the employer's knowledge prior to the damage that is relevant, whether it is knowledge of propensity or knowledge of a particular undue risk. In the present case, there is evidence that Hilldale had a reason to believe that Giacomo was inappropriately involved with a student prior to the time that the school began an active investigation.

In addition, the Oklahoma Supreme Court later classified N.H. as a case in which "recovery against the employer for an act of his servant is rested on prior knowledge of the servant's propensity to commit the very harm for which damages are sought." Schovanec v. Archdiocese of Oklahoma City, 2008 OK 70, ¶ 30, 188 P.2d 158, 167. In the present case, liability is not based on Hilldale's prior knowledge of Giacomo's propensities, but instead on Hilldale's acquired

-26-

knowledge of an ongoing inappropriate relationship and its failure to investigate further. Review of the district court's order further suggests that Hilldale did not challenge the negligent retention and supervision claim on this basis, but instead argued below that the district did not have a duty under state tort law. Aplt.App., Vol. I, at 73-74.

**B.      § 1983—Danger Creation**

Hilldale next contends that the district court improperly permitted J.M.'s danger creation theory to go the jury. Because Hilldale did not challenge the jury instruction on danger creation, it asserts that the instruction was plain error. See Williams v. W.D. Sports, N.M., Inc., 497 F.3d 1079, 1094 (10th Cir. 2007) ("[W]hen a party does not object to an instruction before the district court . . . , we can review the district court's decision to administer the instruction only for plain error.") In order to establish plain error, Hilldale must demonstrate clear or obvious error, which affected Hilldale's substantial rights. See Abuan v. Level 3 Commc'ns, Inc., 353 F.3d 1158, 1173 (10th Cir. 2003). "We may only reverse in an exceptional circumstance, where the error was patently erroneous and prejudicial and where fundamental injustice would otherwise occur." Id.

Under § 1983, state-created danger is recognized as a basis for substantive due process claims. See Vicente-Elias v. Mukasey, 532 F.3d 1086, 1095 (10th Cir. 2008). State actors are liable under § 1983 only for their own actions except where "a state actor affirmatively acts to create, or increases a plaintiff's

vulnerability to, or danger from private violence." <u>Robbins v. Oklahoma</u>, 519

F.3d 1242, 1251 (10th Cir. 2008).

> To state a prima facie case, the plaintiff must show that (1) state actors created the danger or increased the plaintiff's vulnerability to the danger in some way, (2) the plaintiff was a member of a limited and specifically definable group, (3) the defendants' conduct put the plaintiff at substantial risk of serious, immediate, and proximate harm, (4) the risk was obvious or known, (5) the defendants acted recklessly in conscious disregard of that risk, and (6) the conduct, when viewed in total, shocks the conscience.

<u>Id.</u> Hilldale challenges the danger creation claim on a single front and argues that

a danger creation theory applies only when the harm is caused by a private action.

In the present case, Hilldale states that Giacomo was a state actor, citing <u>Moore v.

Guthrie</u>, 438 F.3d 1036 (10th Cir. 2006), which holds that the danger creation

theory does not apply when "the injury occurs due to the action of another state

actor." <u>Id.</u> at 1042.[2]

In <u>Moore</u>, a police officer sued the city under § 1983 after he was shot with

a simulation bullet by another officer during a training exercise. 438 F.3d at

1038-39. This Court concluded that no danger creation claim could lie because

the plaintiff's injury was the result of a bullet shot "by a fellow police officer and

not a private third party." <u>Id.</u> at 1042. In that case there was clearly no "private

---

[2] J.M. argues that Giacomo was not a state actor because his actions were outside the scope of his employment. J.M. cites no authority for the proposition that a person acting outside the scope of his employment as a public school teacher is not a state actor for the purposes of evaluating a § 1983 danger creation theory.

-28-

violence" because the circumstances involved a sponsored training exercise and another police officer. The present case stands in stark contrast to the facts in Moore—there was "private" activity—an inappropriate relationship with a student. See B.T. v. Davis, 557 F.Supp.2d 1262, 1281, n.4 (D. N.M. 2007) (considering whether the defendant in that case was "more like a third party" than the police officer in Moore). There is no parallel between the accident that occurred during the state-sponsored training exercise and the intentional sexual harassment that occurred at the public school. Considering the factual distinctions between this case and Moore, as well as Hilldale's failure to object to the jury instruction, we can discern no "patently erroneous" error in allowing the jury to consider the danger creation claim. Abuan, 353 F.3d at 1173.

C.      Inconsistent Verdicts

Also based on plain error, Hilldale argues that the jury's verdicts for Hilldale on the state failure to report claim and against Hilldale on the Title IX and § 1983 claims were irreconcilably inconsistent. Plain error analysis in this context—where the complaining party failed to object to a general jury verdict before the jury was released—is conducted under a different standard than in other contexts. Bartee v. Michelin N. Am., Inc., 374 F.3d 906, 911. n. 2 (10th Cir. 2004). Under these circumstances, this Court finds plain error "only when verdicts are inconsistent on their face." Id. at 911. "A verdict that resolves separate and distinct causes of action in favor of both parties is not inconsistent

-29-

on its face, [but] when several causes of action are identical and defended on the same ground, a verdict for the plaintiff on one cause of action and for the defendant on another is inconsistent." Id. at 911-12 (internal quotation marks and citation omitted).

In considering the consistency of the verdicts, this Court examines the relationship between the elements of the claims. See Oja v. Howmedica, Inc., 111 F.3d 782, 791 (10th Cir. 1997) The state law failure to report claim consists of the following elements: (1) Hilldale had reason to believe that a child under 18 was a victim of abuse; (2) Hilldale knowingly and willfully failed to report the abuse to the Department of Human Services; (3) the failure to report the abuse was negligent; and (4) Hilldale's failure to report the abuse of J.M. directly caused J.M.'s injuries. Aplt.App., Vol. I, at 121. The Title IX claim required J.M. to establish that "(1) an appropriate person employed by the School District had actual knowledge of, and (2) was deliberately indifferent to; (3) harassment that was so severe, pervasive, and objectively offensive that it; (4) deprived the victim of access to the educational benefits or opportunities provided by the School District." Aplt.App., Vol. I, at 116. Hilldale contends that the jury found that Hilldale had "actual notice" as required by the federal Title IX and § 1983 claims but also concluded that Hilldale did not have a "reason to believe" that J.M. was being abused as required for the state claim and that therefore, the verdicts are inconsistent. Hilldale cites Oja for support.

-30-

In Oja, the jury found for the plaintiff on a negligent failure to warn claim and for the defendant on negligence and strict liability claims.  Id. at 785.  This Court concluded that the similar elements between the failure to warn claim and the strict liability claim were essentially the only disputed elements at trial.  Id. at 791.  The Court explained that in order to find for the plaintiff on the failure to warn claim, "the jury had to find that the [product] was defective at the time of sale and caused her injuries."  Id.  At the same time, in order to find for the defendant on the strict liability claim, "the jury had to find that the PCA hip was either not defective at the time of sale or did not cause her injuries."  Id.  As a result, the verdicts were facially inconsistent.

There is no similar comparison here.  Although the actual knowledge element in the federal claims is similar to the reason to believe element in the state claim, Hilldale does not contend that the knowledge component was "essentially the only disputed element[] at trial."  Id.  The jury could have concluded J.M. did not establish that Hilldale's failure to report the abuse to the state department of human services directly caused J.M.'s injuries.  Instead, a reasonable jury could have concluded that Riddle's failure to report to state authorities did not result in J.M.'s loss, while at the same time determining that Riddle's failure to himself investigate the report did directly cause a portion of J.M.'s injuries.  The verdicts can be read to resolve "separate and distinct causes

of action" and are therefore not inconsistent on their face. <u>Bartee v</u>, 374 F.3d at 911 (internal quotation marks and citation omitted).

**D.    Duplicative Verdicts**

Also as a part of Hilldale's motion for judgment as a matter of law was an argument that the jury's verdicts were duplicative. The district court ruled that the jury's awards on the two § 1983 claims were duplicative and reduced the award against Hilldale by $150,000. On appeal, Hilldale maintains that the separate damages awards for the two § 1983 claims, the Title IX claim, and the state tort claim were duplicative of each other because they were alternate theories for the same relief.

"Whether an award is duplicative is a question of fact," which this Court reviews for clear error. <u>N. Am. Specialty Ins. Co.</u>, 579 F.3d at 1113. "An error is clear only if the court's finding is without factual support in the record or if, after reviewing all the evidence, we are left with a definite and firm conviction that a mistake has been made." <u>Id.</u> (internal quotation marks and citation omitted). Where, as here, the jury is instructed not to award duplicative damages, and the jury returns a total damage figure that is within the range of evidence, this Court is "generally unwilling to disturb or second guess the jury's verdict." <u>Id.</u> Nevertheless, "double recovery is precluded when alternative theories seeking the same relief are pled and tried together." <u>Clappier v. Flynn</u>, 605 F.2d 519, 530 ( 10th Cir 1979). "If a federal claim and a state claim arise from the same

operative facts, and seek identical relief, an award of damages under both theories will constitute double recovery." Mason v. Okla. Turnpike Authority, 115 F.3d 1442, 1459 (10th Cir. 1997).

These arguments require this Court to evaluate the bases for J.M.'s Title IX , § 1983, and state tort claims. The Title IX claim is based on the fact that Hilldale failed to investigate Pembrook's allegations. The § 1983 inaction claim is based on Hilldale's failure to implement a cohesive policy for investigating sexual harassment claims. The state claims—negligent hiring, supervision, and retention—are based on Hilldale's failure to supervise and continued retention of Giacomo after Pembrook alleged that he had an inappropriate relationship with a student. The district court already determined that the danger creation verdict and the inaction verdict were duplicative, and the three remaining claims were based on different operative facts, different failures by Hilldale. In addition, the district court found that the claims represent different injuries: the § 1983 causes of action redressed the loss of personal security and bodily integrity, the Title IX claim redressed the deprivation of access to educational opportunities, and the state tort claim redressed J.M.'s right as a student to be safe from danger.

Hilldale further contends that the only way to reconcile the double recovery instruction with the amount awarded is to read the verdict to award J.M. a total of $150,000. The double recovery instruction contained the following language:

You must not award damages more than once for the same injury. For example, if plaintiff prevails on two claims, and establishes a dollar amount for her injuries, you must not award her any additional damages on each claim. The plaintiff is only entitled to be made whole once, and may not recover more than she has lost. Of course, if different injuries are attributed to the separate claims, then you must compensate the plaintiff fully for all such damages.

Aplt.App., Vol. I, at 144. Hilldale argues that the only way to reconcile the jury's verdict with this instruction is to understand the verdict forms to convey the total recovery at the bottom of each. This argument fails for two reasons. First, each verdict form stated specifically that the jury found for the Plaintiff, on a particular claim, and awarded a specific amount of damages for that claim. As an example, the verdict form relating to J.M.'s inaction theory appears in the record as follows:

We, the jury find the issues in favor of the Plaintiff on her claim under 42 U.S.C., § 1983—Inaction Theory, and assess Plaintiff recovery in the amount of

Compensatory Damages                          $ 150,000.

or

Nominal Damages                               $_____.

Aplt.App., Vol. I, at 155. Each claim corresponded to a similar verdict form. In the instances where the jury found for Hilldale, it left both dollar amounts blank. Considering the structure of the jury forms, we conclude that Hilldale's suggested analysis is unreasonable. In addition, Hilldale's interpretation of the instruction does not permit the jury to conclude that plaintiff had different injuries for more

-34-

than one claim, as the instruction indicates is permissible and as the district court ultimately found for three of J.M.'s claims.

Thus, we are not persuaded by Hilldale's attempt to read the jury's verdict as a single award of $150,000. Further, although Hilldale's actions and J.M.'s injuries are based on a single underlying occurrence—Giacomo's sexual harassment—the jury's separate awards are supported by different conduct on the part of Hilldale and by J.M.'s different injuries. Accordingly, there is no clear error by the district court in awarding three separate awards for these separate deprivations. See Berry v. City of Muskogee, Okla., 900 F.2d 1489, 1507 (10th Cir. 1990) (noting that § 1983 damages are based on common law tort remedies, which compensate a plaintiff for the injury caused by the defendant's breach of duty); see also Clappier, 605 F.2d at 529 (considering the interest protected, as well as the relief afforded, by the arguably alternative claims).

### E.    J.M.'s Cross Appeal

In her cross appeal, J.M. argues that the district court improperly reduced the jury's verdict in its *Amended Judgment*. After considering Hilldale's motion for judgment as a matter of law, the district court reduced two of the damages awards. Aplt.App., Vol. I, at 246, 250. First, the court determined that the two § 1983 claims were duplicative and reduced the verdict accordingly. Aplt.App., Vol. I, at 246, n. 2. Second, the district court reduced the damages on the state negligence claim from the $150,000 awarded by the jury to the $125,000 that is

permissible under the Oklahoma Governmental Tort Claims Act, 51 Okla. Stat. Ann.§ 154(A)(2).  Aplt.App., Vol. I, at 249, 250.  As set forth earlier, this Court reviews the district court's finding that an award is duplicative for clear error.  N. Am. Specialty Ins. Co., 579 F.3d at 1113.

J.M.'s theory on cross appeal is that because the jury was instructed to avoid double recovery and because this Court presumes that juries follow instructions, the only way to explain the award is that the jury intended to award a total of $600,000.  Hilldale maintains that it was the responsibility of the district court to reduce the verdict because the two § 1983 claims arose from the same injury.  The district court agreed with Hilldale, concluding that, despite its instruction stating that "[y]ou must not award damages more than once for the same injury," Aplt.App., Vol. I, at 144, the jury awarded damages for both § 1983 claims, which addressed the same injury:  the right to personal security and bodily integrity as protected by the substantive due process.  See Aplt.App., Vol. I, at 247-48.

J.M. cites Gentile v. County of Suffolk, 926 F.2d 142 (2nd Cir. 1991) and Youren v. Tintic Sch. Dist., 343 F.3d 1296 (10th Cir. 2003) for support.  In Gentile, the plaintiffs provided substantial evidence that supported different damages for their § 1983 claims and their state claims.  Id., 926 F.2d at 153-54.  In addition, a jury poll demonstrated that the jury intended to award "independent" damages for each claim.  Id. at 154.  J.M. has not articulated

independent bases for the separate § 1983 actions—that either separate duties were breached or separate injuries resulted.  In Youren, this Court was persuaded by the district court's instruction to the jury prohibiting duplicative verdicts.  In addition, the plaintiff offered the Youren Court an explanation for the division of the damages award between the school district and the school district's agent, sued in her official capacity.  343 F.3d at 1306.  Apparently, the court permitted an award against the agent separately in order to "publicly sanction" the agent for violations of the Whistleblower Act.  Id.  There is no such explanation in the present case.

As stated earlier, J.M. contends that the jury intended to award $600,000 total and that any incompatibility between the awards should not result in a reduction of the total amount, but rather a shifting so that the permissible awards are simply increased to compensate for reduction of improper awards.  We are not persuaded.  The jury specifically awarded J.M. $150,000 for a state law claim that carried a statutory damages cap of $125,000.  The district court reasonably reduced the single award by $25,000—J.M. suggests that the $25,000 should simply be imputed to another claim.  There is no support for such a transfer of a damages award, and we decline to do so.

The district court read the verdicts as four individual $150,000 awards and after determining that two of those $150,000 awards were based on identical injuries, eliminated one $150,000 award.  Review of the instructions and the

verdict forms satisfies us that the district court's order vacating one of the § 1983 awards demonstrates no clear error. Further, the district court's reduction of the state tort award to match the statutory damages cap is also not clear error—or any error at all under 51 Okla. St. Ann. § 154(A)(2) ("The total liability of the state and its political subdivisions on claims within the scope of The Governmental Tort Claims Act, arising out of an accident or occurrence happening after the effective date of this act, Section 151 et seq. of this title, shall not exceed . . . One Hundred Twenty-five Thousand Dollars ($125,000.00) to any claimant for a claim for any other loss arising out of a single act, accident, or occurrence." (internal footnote omitted)).

## III.    Conclusion

For the reasons stated above, Hilldale's motions before this Court are granted, and we **AFFIRM** the district court.

ENTERED FOR THE COURT,


M. Christina Armijo
District Judge Sitting by Designation