**FILED**
**United States Court of Appeals**
**Tenth Circuit**

# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

**September 6, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

_____

RUSSELL NATION, individually and as
parent and next friend of J.N., a minor;
CAROL NATION, individually and as
parent and next friend of J.N., a minor,

    Plaintiffs - Appellants,

v.

PIEDMONT INDEPENDENT SCHOOL
DISTRICT NO. 22; HOLLY NOELLE
MORRIS,

    Defendants - Appellees.

No. 21-6123
(D.C. No. 5:18-CV-01090-R)
(W.D. Okla.)

_____

### ORDER AND JUDGMENT[*]

_____

Before **HARTZ**, **BALDOCK**, and **McHUGH**, Circuit Judges.

_____

Russell and Carol Nation filed this suit on behalf of themselves and J.N., their

minor child. J.N., who is autistic and nonverbal, was one of eight or so students in

Holly Morris's special-education class at Piedmont Middle School in Piedmont,

Oklahoma, during the school years of 2016–17 and 2017–18. It is undisputed that

during the 2017–18 school year, Morris physically and verbally abused J.N. and other

students. Morris reportedly slammed J.N.'s head against a bathroom wall, punched

---

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

him, knocked him out of his desk, pulled his hair, and made disparaging comments to him.

The Nations filed suit against Piedmont Independent School District No. 22 (the District) seeking damages under 42 U.S.C § 1983 on multiple grounds, including failure to train and supervise its employees, and under Oklahoma's Governmental Tort Claims Act on various state-law claims. After denying as untimely the Nations' motion to amend to add claims under the Americans with Disabilities Act and the Rehabilitation Act of 1973, the United States District Court for the Western District of Oklahoma entered summary judgment for the District on the § 1983 claims, stating that there was insufficient evidence of violations of J.N.'s constitutional rights after the District was made aware of Morris's pattern of abuse. It also held that the District was not liable for negligence under state law.

The Nations appeal these decisions. We affirm the district court's denial of the Nations' motion to amend. We also affirm the summary judgment for the District on the § 1983 claim, but on a ground different from that relied on by the district court. Even if there was sufficient evidence of injury after the District was put on notice, the Nations nevertheless failed to demonstrate that the District acted with deliberate indifference to the risk of further injury to J.N. As for the negligence claim, after summary judgment was granted on the § 1983 claims the district court should have declined to exercise supplemental jurisdiction over any state-law claims. We therefore remand with instructions to dismiss the negligence claim without prejudice.

2

## I.    APPELLATE JURISDICTION

Although neither party raises a jurisdictional objection to our review, we have an "independent duty" to ensure our jurisdiction. *Amazon, Inc. v. Dirt Camp, Inc.*, 273 F.3d 1271, 1274 (10th Cir. 2001).

After the Nations filed a petition in Oklahoma state court, the case was removed to federal court. Their first amended complaint alleged claims against the District under (1) 42 U.S.C. § 1983; (2) Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681; and (3) various state-law causes of action; it also alleged state-law claims against Morris. The district court had jurisdiction to hear the federal claims under 28 U.S.C. § 1331 and had supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367.

The district court granted in part the District's motion to dismiss, the District's motion for summary judgment, and Morris's motion for partial summary judgment, leaving only a state-law claim for assault and battery against Morris and a state-law respondeat superior claim against the District. The court did not address whether it should have declined jurisdiction over the state-law claims under 28 U.S.C. § 1367(c)(3) after disposing of the federal claims. *See generally Smith v. City of Enid By & Through Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998) ("When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims.").

Five days later the parties filed a joint stipulation to dismiss without prejudice the remaining state-law claims. A motion for reconsideration of the summary-

judgment order disposing of the § 1983 claims was denied and the Nations appealed to this court.

Under 28 U.S.C. § 1291 we generally have jurisdiction to hear only appeals from final decisions of the district courts. *See Amazon*, 273 F.3d at 1275. Thus, the question arises whether the disposition below—where the jurisdiction-supplying federal claims have been adjudicated and the lingering supplemental state-law claims have been voluntarily dismissed without prejudice—reflects a final decision allowing review of the adjudicated claims. We hold that it does.

As a general matter, when some claims in an action have been dismissed with prejudice, a dismissal of the remaining claims *without prejudice* does not create a final appealable decision because the district court's job may not be over. *See Jackson v. Volvo Trucks N. Am., Inc.*, 462 F.3d 1234, 1238 (10th Cir. 2006) ("Our general rule is that a party cannot obtain appellate jurisdiction where the district court has dismissed at least one claim without prejudice because the case has not been fully disposed of in the lower court."); *Cook v. Rocky Mountain Bank Note Co.*, 974 F.2d 147, 148 (10th Cir. 1992) ("[W]hen a plaintiff voluntarily requests dismissal of her remaining claims without prejudice in order to appeal from an order that dismisses another claim with prejudice, we conclude that the order is not 'final' for purposes of § 1291."). In particular, when the claims dismissed without prejudice are federal claims or between diverse parties, the plaintiff may be free to refile those claims in federal court at a later time. Thus, permitting an appeal would enable the plaintiff to circumvent Federal Rule of Civil Procedure 54(b), which permits entry of final

4

judgment (which could be appealed) as to some but not all claims only if the district court "expressly determines that there is no just reason for delay." *See Cook*, 974 F.2d at 147–48 (voluntary dismissal without prejudice of two federal claims did not create finality regarding a third claim previously dismissed with prejudice, because the plaintiff "remain[ed] free to file another complaint raising those same [federal] claims"; plaintiff had "attempted to subvert the requirements of Rule 54(b) by voluntarily dismissing" her federal claims).

But we have recognized necessary exceptions to this general rule, particularly when there would otherwise be no avenue for appeal in federal court. *See Jackson*, 462 F.3d at 1238 (noting that the rule outlined in *Cook* "does not apply in every circumstance"). For example, the same freedom to refile in federal court is usually not available for *supplemental* state claims dismissed without prejudice. Accordingly, in *Amazon*, 273 F.3d at 1275, we held that a case had been finally disposed of when a district court declined to exercise jurisdiction over supplemental state-law claims after adjudication of all related federal claims, as is generally the expectation in this circuit, *see Smith*, 149 F.3d at 1156. We explained:

> Although a dismissal without prejudice is usually not a final decision, where the dismissal finally disposes of the case so that it is not subject to further proceedings in federal court, the dismissal is final and appealable. The critical determination as to whether an order is final is whether plaintiff has been *effectively excluded from federal court under the present circumstances*.

*Id.* (brackets, citations, and internal quotation marks omitted) (emphasis added). Otherwise, "a district court's order dismissing federal claims . . . would be

effectively unreviewable." *Hyde Park Co. v. Santa Fe City Council*, 226 F.3d 1207, 1209 n.1 (10th Cir. 2000).

We have applied this "effectively excluded" principle even where the parties, rather than the court, initiate a dismissal without prejudice. *See, e.g., Spring Creek Expl. & Prod. Co., LLC v. Hess Bakken Inv., II, LLC*, 887 F.3d 1003, 1015–16 (10th Cir. 2018) (plaintiffs "effectively excluded" from federal court when their voluntarily dismissed state claims were resolved in arbitration); *Hyatt v. Bd. of Regents of Oklahoma Colleges*, 659 F. App'x 522, 524 (10th Cir. 2016) (voluntary dismissal without prejudice of § 1983 claim was not a bar to appellate review because the statute of limitations for refiling the dismissed claim had passed).

Here, there is no way for the state-law claims between the nondiverse parties to return to federal court—unless we reverse on the jurisdiction-supplying federal claim. The practical effect of the stipulated voluntary dismissal in this case is therefore the same as the court's dismissal in *Amazon*. As in *Amazon*, it is of no moment that the supplemental claims might be revived if the jurisdiction-providing claims were to be reinstated after appeal. *See Est. of Smart by Smart v. City of Wichita*, 951 F.3d 1161, 1177 (10th Cir. 2020) ("[W]hen we reverse a district court's dismissal of a federal law claim, we often also direct the district court to reconsider whether to exercise supplemental jurisdiction over any state law claims it dismissed along with the federal claim."); *see also* 15A Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice & Procedure* § 3914.8 at 623 (2d ed. 1992) ("The threat to finality posed by voluntary or invited dismissals depends on the

6

question whether *a plaintiff who loses the subsequent appeal* is permitted to recapture the matters relinquished to establish finality." (emphasis added)).

We see no compelling reason to treat the situation here as different from the one in *Amazon*. Treating the judgment below as final does not circumvent the requirements of any rule of procedure; on the contrary, it furthers the general policy of dismissing state-law claims without prejudice when the court has entered a pretrial dismissal of the claims upon which federal jurisdiction is predicated. We hold that there is a final judgment here and that we have jurisdiction.

## II.     ANALYSIS

"We review the district court's grant of summary judgment de novo, applying the same standard used by the district court. Summary judgment is appropriate only if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1114 (10th Cir. 2007) (ellipsis, citations, and internal quotation marks omitted). We view the evidence in the light most favorable to the Nations as the nonmoving party, drawing all reasonable inferences in their favor. *See id.*

### A.     Section 1983 Liability

The Nations argue that the District's failure to adequately train and supervise its employees resulted in violations of J.N.'s right to due process.[1] First, they claim

---

[1] The District's appellate brief failed to argue that Morris's abuse did not rise to the level of a due-process violation. Although counsel briefly mentioned during oral argument that any injuries that occurred after the District was on notice may not

that the District lacked a written policy for reporting teacher abuse and that it failed to train its staff to report misconduct after it became aware of Morris's treatment of the students. Second, they claim that the District failed to increase supervision or follow-up on various complaints it received about Morris.

Because Defendant is a public-school district, the municipal-liability framework applies. *See Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1188 (10th Cir. 2010). "Municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by city policymakers." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989) (brackets and internal quotation marks omitted). A municipal entity cannot be held vicariously liable for the acts of its employees; it is liable only for its own acts—that is, "when the execution of [its] policy or custom inflicts the injury." *Id.* at 385 (ellipsis and internal quotation marks omitted). In addition to promulgated policies or decisions, a "policy or custom may take the form of . . . failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused." *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (internal quotation marks omitted).

"Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick*

---

qualify, "[i]ssues raised for the first time at oral argument are considered waived." *Fed. Ins. Co. v. Tri-State Ins. Co.*, 157 F.3d 800, 805 (10th Cir. 1998).

*v. Thompson*, 563 U.S. 51, 61 (2011) (brackets and internal quotation marks omitted). A municipal entity is deliberately indifferent if it has "actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Id.* at 789 (internal quotation marks omitted). Although it "may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees," when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights," the policymakers' failure to train or supervise "may fairly be said to represent a policy for which the [municipality] is responsible." *Canton*, 489 U.S. at 390. "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61.

The requisite notice can be established by "proving the existence of a pattern of tortious conduct" or, in some cases, without such a pattern "if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction." *Bryson*, 627 F.3d at 789 (internal quotation marks omitted); *see Canton*, 489 U.S. at 390 n.10. It is not enough to show that more or better training or supervision may have helped avoid the injury. *See Canton*, 489 U.S. at 391. The training deficiency must have been the "moving force behind the injury alleged." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997) (internal quotation marks omitted); *see, e.g.*, *Carr v. Castle*, 337 F.3d 1221, 1231–32 (10th Cir. 2003) (even if police officers were inadequately trained to

9

respond to an aggressive suspect, "[t]hey were not trained . . . to shoot [the suspect] repeatedly in the back after he no longer posed a threat").

The District's liability therefore depends on what its relevant policymakers knew about Morris's conduct, when they knew it, and how they responded. Whether a school administrator is considered a policymaker (a final decisionmaker on relevant matters) depends on the specific circumstances of the case and it may be hotly contested. *See Brammer-Hoelter*, 602 F.3d at 1189–90; *Brown v. Gray*, 227 F.3d 1278, 1288–89 (10th Cir. 2000). But here the parties appear to assume that the District is not liable for the actions or inaction of the paraprofessionals and teachers, but that it may be liable for the conduct of higher authorities, such as the directors involved or the school principals. The District makes no distinction between various administrators in its brief nor does it argue that liability cannot be based on their decisions. We therefore assume, without deciding, that the District could be liable for the deliberate indifference of those administrators. Even with this assumption, however, we affirm dismissal of the § 1983 claims because of the absence of evidence that any administrator acted with deliberate indifference. We limit our discussion to McDonald because there is no evidence that another administrator had more relevant information than he did or took relevant action beyond what he took.

We summarize the various complaints made about Morris's classroom and the steps taken by McDonald in response: There appear to have been no complaints about Morris during the 2016–17 school year, Morris's first year at Piedmont; and Carol Nation testified that she was happy with Morris as J.N.'s teacher during that year. At

the end of the school year, however, a departing paraprofessional (or aide) who worked in Morris's classroom told Lynda White, the District's Director of Special Services, that she "didn't like how some of the language was and how the kids were being treated" in Morris's class. Aplt. App., Vol. III at 752. But her complaints were not specific and did not mention any inappropriate contact. White suggested to then vice principal Andrew Graham that he do some "unannounced walk-throughs" to see if he heard anything. *Id.* at 752. That summer, Graham was replaced by Nadia DeKoch, but no one relayed these complaints to her.

Less than a month into the following school year, in early September of 2017, Tanya Caraballo, a paraprofessional in Morris's class, approached Principal Clay McDonald with concerns about the classroom. She testified that she was "kind of vague" and told McDonald that they needed additional staff. *Id.* at 593. McDonald testified that they talked generally about the "intensity" and "volatility" of the classroom and D.O., one particularly difficult student. *Id.* at 633–34. McDonald told Caraballo he would speak with Morris. According to Caraballo, Morris held a team meeting the next day and told the paraprofessionals that "if [they] didn't like the way that she was doing things, . . . [they] could find another job." *Id.* at 594.

McDonald testified that during the fall semester some employees shared "how intense that room was," and that it was crowded and needed more support. *Id.* at 620. Morris herself told McDonald she felt her classroom was understaffed. And McDonald testified he was well-aware of the staffing concerns: "I'm in there four to five times out of the week, . . . I know, and . . . the upper administration would come

11

over sometimes and help, . . . and we just knew it was just a very difficult situation."
*Id.* at 623. The employees mentioned that Morris seemed stressed, got upset, or was
"having it rough right now," but no one reported that she was making improper
physical contact. *Id.* at 622. The District hired an additional paraprofessional in
September, brought in behavior specialists to work with D.O. and provide additional
training to the class staff, and, according to McDonald, he or DeKoch walked by the
classroom daily to provide support.

On September 15, 2017, the Nations met with Morris to discuss bruising
around J.N.'s collarbone and J.N.'s behavior. Morris sent McDonald, DeKoch, and
Dr. Courtney Lockridge, Executive Director of Educational Services, an email to
notify them about the meeting, explaining that she "did not have an answer for" the
bruising and that she and the Nations discussed J.N.'s increased aggression at school,
which the Nations said they did not see at home. Aplt. App., Vol. II at 441. She also
recounted a "fright[ening]" episode with J.N. that day when he grabbed her neck, and
she included photos of her neck. *Id.*

Also in mid or late September, Caraballo approached McDonald again.[2] This
time she shared explicit concerns about Morris's conduct, saying that she once saw
Morris "slam[] [J.N.'s] head against the wall" when they took him to the bathroom

---

[2] Caraballo first contacted White for advice about how to approach her second
complaint with McDonald. White advised her to be as specific as possible with him.
Nothing in the record indicates what details Caraballo provided to White.

together; that she had flipped his desk, causing him to fall; and that she made disparaging remarks to him. *Id.* at 603.

The district court ruled that this meeting was sufficient to put McDonald, and therefore the District, on notice of Morris's unconstitutional behavior. We agree. The reports before this meeting about staffing and the intensity of the class did not suggest that Morris was abusing students, even if they may have indicated the class was dysfunctional. Without notice that training or supervision is "deficient in a *particular* respect, decisionmakers can hardly be said to have deliberately chosen" a form of training or supervision likely to cause constitutional violations. *Connick*, 563 U.S. at 62 (emphasis added); *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1286 (10th Cir. 2019) (reports of inmate injuries, without indication that injuries were related to officers' use of force, "fail to suggest any deficiency in Denver's excessive-force training"). We therefore consider only the involved administrators' conduct after this point to determine whether the District acted with deliberate indifference.

According to Caraballo, after her second meeting with McDonald he said, "That doesn't seem like [Morris], but I'll talk to her." Aplt. App., Vol. II at 387. McDonald testified that it was "hard to navigate what was really happening" and he wondered if Caraballo was "trying to get [Morris] in trouble" because she was telling him "stuff [he] had never witnessed or . . . heard from anybody else at that point." *Id.*, Vol. III at 724. He said, "[I] was just trying to figure out the best way to handle it because [Caraballo and Morris] did have a very close interworking relationship . . . ,

13

and so [I] wanted to make sure we kept that relationship going for the benefit of the class." *Id.* McDonald then met with Morris about this complaint; the specific contents of this meeting are not revealed in the record but Morris presumably denied the allegations, as she did during her deposition. After this meeting, according to Caraballo, Morris again told the paraprofessionals that if they did not like how she ran her class, they could find new jobs. There is no evidence that Caraballo told McDonald, or that McDonald was otherwise aware, that Morris had been threatening the paraprofessionals.

In October the Nations met with Morris and McDonald about a cut on J.N.'s head and why he continued to be "so much more aggressive that year than he ever had been." *Id.*, Vol. II at 363. Morris told them that J.N. slipped in the bathroom and scratched his head. They also "exchanged ideas of things to try" to resolve his aggression. *Id.* at 364. On October 12 the Nations sent McDonald a follow-up email, suggesting that J.N. be allowed to walk outside or go to P.E. class to help calm him. McDonald replied that they had tried this and it seemed to work. There is no evidence the Nations reported any issues to the school after this time.

The next week, on October 19, McDonald created a document outlining certain procedures for Morris's classroom, titled "Expectations for paraprofessionals" (EFP). *Id.* at 444. He testified that the EFP was intended to put in place procedures for specific students and remind everyone of proper classroom protocols. The EFP required, among other things, that "[t]wo staff members must be with [J.N.] when he is taken to the restroom"; that "[i]f the number of staff is short or the ability to have

14

all eyes on students in the room is not available, staff members must call the office immediately for help"; and that "[s]taff members are not to be on their cell phones while they are supervising students." *Id.* McDonald met with Morris and each paraprofessional individually to review and sign the expectations; there is no evidence that anyone shared examples of abuse or mentioned fear of Morris during these meetings.

DeKoch said in her affidavit that she and McDonald "regularly visited Morris' classroom and observed [Morris]," and that she performed evaluative observations of Morris in September, November, and December, *id.* at 282; McDonald testified he was in Morris's classroom "at least four to five days out of the week," *id.* at 254. Neither DeKoch nor McDonald saw Morris violating any policies or mistreating the students, and she received high marks on her formal evaluation in December. Caraballo and another paraprofessional said that Morris changed her behavior when the principals were around.

Morris acknowledged that McDonald stopped by the class often and would spend about five minutes either talking to students or observing. Caraballo, on the other hand, said he came to the classroom "[o]nly whenever [they] called for help." *Id.*, Vol. III at 595. But she also said that McDonald began observing the class more often in late November.

On January 16, 2018, Morris was seen forcefully dragging D.O. down the hall, causing several employees to approach McDonald the next day with allegations about Morris's increased aggression and abuse of the students. Morris was suspended that

morning. At the District's request the special-education staff submitted written statements to the District and the police about their observations. These statements revealed that staff had seen Morris push J.N. against the wall; punch him in the genitals to get him to stop masturbating; and "yank his hair to get him to do work on occasion," App. Vol. III at 463. They also reported that Morris was increasingly taking J.N. to the bathroom alone, often when she was upset with him, and that J.N. returned with marks after one or more of these bathroom trips. As part of the police investigation, the Nations provided photos on January 23 of scratches on J.N.'s head that "occurred not long after Christmas Break." *Id.* at 671.

In light of this evidence we are not as certain as the district court that the Nations could not show injury after Caraballo's second complaint. Regardless, this evidence does not demonstrate deliberate indifference to the risk of further injury to J.N., even if McDonald could have done more to protect the students.

The failure of remedial measures does not establish deliberate indifference. *See Doe on Behalf of Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 219 (5th Cir. 1998) ("[t]he fact that [the principal] misread the situation and made a tragic error in judgment does not create a genuine issue of material fact as to whether she acted with deliberate indifference" when she spoke with the accused teacher and determined the student's abuse allegations were untrue); *cf. J.M. ex rel. Morris v. Hilldale Indep. Sch. Dist. No. 1-29*, 397 F. App'x 445, 453 (10th Cir. 2010) (in Title IX case, finding that, unlike the principal in *Doe* who took steps to corroborate allegations, a principal who failed to even question the alleged perpetrator or victim after hearing allegations

16

of sexual abuse may be deliberately indifferent). For example, in *Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1125 (10th Cir. 2008), the plaintiff claimed that the school district had "a custom of acquiescing to student sexual harassment" because it knew of complaints about sexual harassment by the students who assaulted plaintiff's daughter and had previously disciplined one of those students for sexual harassment. But, we said, these steps indicated that "the district was aware of several discrete problems and was working to remedy them— which only raises an issue of the district's negligence, not its deliberate indifference." *Id.* at 1125. And there, the school district was aware of multiple complaints of harassment, which had been corroborated.

By contrast, here, McDonald had received only one complaint that Morris had physically abused a student. And after Caraballo's report, which McDonald reasonably took with a grain of salt (because it was inconsistent with all his previous knowledge of Morris), he met with Morris and she apparently denied the allegations. Nevertheless, he formalized procedures for the class that would ensure there was always another member of the staff with Morris and J.N. and sufficient support staff in the classroom (that is, "eyes on all the students" at all times); otherwise, staff members were to call the office immediately, Aplt. App., Vol. II at 444; he discussed those expectations with Morris and each of the paraprofessionals individually and they signed a document memorializing those expectations.

In addition, McDonald and his vice principal increased their personal observations of Morris's classroom yet observed no misconduct. Although the

17

Nations argue that McDonald's short visits were not designed to catch misconduct, McDonald spent longer periods of time in the classroom helping out when it was short-staffed and DeKoch performed evaluations of Morris in September, November, and December.

Thus, from McDonald's perspective, the remedial measures appeared to be effective, or Caraballo's observations represented one-off incidents. He received no other complaints until January, the principals had not observed any inappropriate behavior, and Morris received high marks on her evaluations. Once McDonald learned that Morris was violating classroom policies and abusing students, she was suspended the very same day.

Further, McDonald had no reason to believe that employees were not reporting Morris's abuse. The staff was instructed that "if there was something that was off, to report it to your principal." Aplt. App., Vol. II at 593. And several employees other than Caraballo *had* approached McDonald with a variety of concerns about Morris's class environment and her stress levels. It was hardly obvious that those employees would decline to report more egregious misconduct and abuse.

In retrospect, one might wish that MacDonald had believed Caraballo rather than Morris at the outset. But we do not think that a reasonable factfinder could infer from the evidence presented to the district court that McDonald was deliberately indifferent to the risk that Morris might pose to J.N.  We therefore affirm the summary judgment in favor of the District on the § 1983 claims.

18

## B.     Negligent Failure to Investigate

The district court also granted judgment for the District on Plaintiff's negligent-investigation claim under the Oklahoma Governmental Tort Claims Act on the same grounds as the § 1983 claim. Ordinarily, though, the court should dismiss supplemental state-law claims without prejudice once it grants pretrial motions dismissing all the claims on which federal jurisdiction is based. *See Smith*, 149 F.3d at 1156. We therefore reverse with instructions to the district court to do so on remand.

## C.     Denial of Motion to Amend

"We review for abuse of discretion a district court's denial of a motion to amend a complaint after the scheduling order's deadline for amendments has passed." *Birch v. Polaris Indus., Inc.*, 812 F.3d 1238, 1247 (10th Cir. 2015). The party seeking to amend must generally show good cause—for example, learning new facts during discovery. *See id.* "Courts have denied leave to amend . . . where the moving party cannot demonstrate excusable neglect, . . . [such as] where [it] was aware of the facts on which the amendment was based for some time prior to the filing of the motion to amend." *Fed. Ins. Co. v. Gates Learjet Corp.*, 823 F.2d 383, 387 (10th Cir. 1987).

In March 2021—almost a year after the time to submit amended pleadings expired—Nations moved for leave to amend their complaint to add claims under the Americans with Disabilities Act and the Rehabilitation Act of 1973. They asserted that "[t]hrough discovery in this case, the Nations learned new details about the underlying facts," citing production of documents by the police on October 1, 2020 (in response to the Nations' subpoena), which included District employees'

19

statements to police. The district court denied the motion: "This case has been pending for over two years. Allowing the proposed amendments would in many respects start the case over. [The Nations] have failed to cite the discovery of new facts that could not have been [discovered] earlier with due diligence." Aplt. App., Vol. I at 177.

This was not an abuse of discretion. The Nations did not explain in district court what new facts supported the existence of an ADA claim beyond the information already available to them, or why that information could not have been discovered earlier. We have held undue delay alone to be reason enough to deny a motion to amend. *See Hayes v. Whitman*, 264 F.3d 1017, 1026 (10th Cir. 2001).

### III.    CONCLUSION

We **AFFIRM** the district court's grant of summary judgment for the District on the § 1983 claim and its denial of the Nations' motion for leave to amend. We **REVERSE** summary judgment for the District on the state-law negligence claim and **REMAND** with instructions to dismiss the claim without prejudice.

Entered for the Court

Harris L Hartz
Circuit Judge